Louis N. Pokress and Lucille A. Pokress (Husband and Wife) v. Commissioner.
Pokress v. Commissioner
Docket No. 32205.
United States Tax Court
T.C. Memo 1954-128; 1954 Tax Ct. Memo LEXIS 118; 13 T.C.M. (CCH) 805; T.C.M. (RIA) 54234; August 17, 1954, Filed *118 W. G. Ward, Esq., and Charles B. Costar, C.P.A., First National Bank Building, Miami, Fla., for the petitioners. James R. Harper, Jr., Esq., for the respondent. LEMIRE Memorandum Findings of Fact and Opinion Respondent determined a deficiency in income tax of the petitioners for the year 1946 in the amount of $20,057.44. The contested issue is whether in the taxable year involved petitioners incurred a loss as a result of loans to Pappy's, Inc., a Florida corporation, and whether, if a loss was incurred, it was a business or a nonbusiness bad debt. Findings of Fact Petitioners, husband and wife, are residents of Miami Beach, Florida. Their joint income tax return for 1946 was filed with the collector of internal revenue for the district of Florida. As petitioner Lucille A. Pokress is involved only by reason of having filed a joint return with her husband, Louis N. Pokress, the latter will hereinafter be referred to as petitioner. During the year 1946, and for a period of some 20 years prior thereto, petitioner was engaged in the real estate business in Miami Beach, Florida, representing largely a northern clientele in the purchase and sale of business and *119 investment properties, hotels, and restaurants. In representing his out-of-town clients petitioner frequently advanced his own funds as earnest money in order to secure a particular sale. Petitioner, later, would receive his commission on the sale by subsequent reimbursement from the client. In the fall of 1944 Louis Goldman, an associate of petitioner in his real estate brokerage business, advised petitioner that a client in Philadelphia was interested in purchasing Pappy's, Inc., a restaurant in Miami Beach. The client, upon being advised that the sale price for all of the corporation stock was $150,000, asked petitioner to put up the necessary advance money to secure the sale. Thereupon, and in accordance with his usual practice, petitioner advanced the sum of $25,000 to Julius Kasdin, holder of the total outstanding stock of Pappy's, Inc., and hereinafter referred to as Kasdin. Some 10 days after making the $25,000 advance, petitioner was advised by the Philadelphia client that he no longer desired to purchase Pappy's, Inc. Rather than forfeit his $25,000 deposit petitioner decided to consummate the deal with Kasdin. Petitioner did not intend to go into the restaurant business *120 but was merely attempting to recoup his $25,000 deposit by finding a subsequent purchaser for Pappy's, Inc.
The principal asset of Pappy's, Inc., was a lease on the premises occupied by the restaurant in the Vanderbilt Hotel, Miami Beach. The original lease executed in April 1939 was acquired by Pappy's, Inc., as lessee, on July 30, 1941. The lease provided a fixed rental of $7,000 per annum through 1949, and $7,500 thereafter until June 1, 1954. In addition, the lessee had an option of renewal for an additional 10 years. The lease of July 30, 1941, to Pappy's, Inc., provided that any principal improvement to the leasehold or addition to the fixed assets should become the property of the lessor. The lessee always had the use of the fixed assets and leasehold improvements. By an agreement of November 22, 1944, and a supplemental agreement thereto dated December 7, 1944, petitioner's associate, Louis Goldman, obtained an option good until April 1, 1945, to purchase all the outstanding capital stock of Pappy's, Inc., from Kasdin for the sum of $135,000. Under the terms of the agreement petitioner and Louis Goldman were to be permitted to operate Pappy's, Inc., from the first part *121 of December 1944, until April 1, 1945. During that period it was agreed that petitioner would individually guarantee Kasdin against any loss arising from the operation of the business. On April 1, 1945, petitioner and Louis Goldman acquired legal title to all the stock of Pappy's, Inc., for the purchase price of $135,000. Petitioner received 2/3 and Goldman 1/3 of the outstanding stock. All of the corporate stock was then pledged to Kasdin as security for the two promissory notes aggregating $90,000, representing part of the purchase price. The agreement also provided that Pappy's, Inc., would not be liquidated without the consent of Kasdin, and that in the event such a liquidation was approved Kasdin was to acquire a first lien upon the assets of the corporation to the extent that petitioner and Louis Goldman were still individually obligated on their stock payments. Following the acquisition of Pappy's, Inc., petitioner made various attempts in 1945 and 1946 to sell the stock, without success. Pappy's, Inc., made gross sales in the fiscal years indicated in the following amounts: F/Y ended
Oct. 31
1944
$192,945.26
1945
252,206.26
1946
170,642.70 *
*122 The corporation continued to lose money and the petitioner, in an effort to salvage his investment, made personal advances totaling $43,922.86. On July 15, 1946, a resolution was adopted by the directors and stockholders to liquidate the corporation. The resolution provided that the assets were to be distributed pro rata to the shareholders who, in turn, were to assume all of the liabilities. On July 25, 1946, the corporation executed an assignment of the lease of July 30, 1941, to petitioner and Goldman. A statement prepared from the books as of July 15, 1946, discloses the following: ASSETS REALIZED
Cash
$ 468.26
Accounts receivable
104.05
Inventory - food
250.00
Unexpired insurance
620.86
Security deposit
3,000.00
Utility deposits
625.00
Total assets realized
$ 5,068.17
LIABILITIES ASSUMED
Accounts payable
11,875.85
Unremitted withholding taxes
36.56
Accrued personal property taxes
405.72
Accrued social security taxes
780.78
Accrued state unemployment taxes
239.13
Accrued interest
180.00
Total liabilities assumed
13,518.04
Excess of liabilities assumed over assets received
$ 8,449.87
*123 LOSS IN LIQUIDATION
Louis N.
Louis
Total
Pokress
Goldman
Excess of liabilities assumed over assets received
$ 8,449.87
$ 5,633.25
$ 2,816.62
Capital stock
136,500.00
91,000.00
45,500.00
Loans payable to stockholders
57,764.80
43,922.86
13,841.94
Totals
$202,714.67
$140,556.11
$62,158.56
The lease of July 30, 1941, was never carried as an asset on the books of the corporation. In the early fall of 1946 petitioner contacted one Cummings, who was Howard Johnson's representative in Miami Beach, for the purpose of working out a deal with respect to the lease acquired in the liquidation of Pappy's, Inc.
On November 6, 1946, an agreement was executed by and between petitioner, Louis Goldman, the Vanderbilt Hotel Corporation, owners and lessors of the premises in question, Julius Kasdin, and one Henry D. Williams. The agreement first cancelled the existing lease between petitioner, Louis Goldman, and the Vanderbilt Hotel Corporation. It then provided that Henry D. Williams was to become the rent collecting agent for the lease which was to be executed concurrently between the Vanderbilt Hotel Corporation and the Cummings Corporation, *124 a Florida corporation, connected with the Howard Johnson chain and hereinafter referred to as Howard Johnson. This trust or escrow agreement provided that all rentals paid by Howard Johnson were to be paid to Henry D. Williams, who, in turn, was to make annual payments in the following order: (1) to Julius Kasdin in the amount of $8,888.88, representing the installment obligation of petitioner and Goldman for the original stock purchase; (2) to the Vanderbilt Hotel Corporation, as lessor, to the extent of $7,000; and (3) the balance of the payments, if any, to petitioner and Goldman. The trust agreement was to terminate at the end of the first eight years of the concurrent lease, or at such time as petitioner and Goldman had been paid $71,633.32. It was specifically provided in the agreement that in the event payment from Howard Johnson did not equal $7,000, petitioner and Goldman would individually be responsible for the payments to the Vanderbilt Hotel Corporation, lessor. By an agreement dated November 4, 1946, the Vanderbilt Hotel Corporation, lessor, and Howard Johnson, lessee, entered into a 17-year lease for the premises formerly occupied by Pappy's, Inc., in which Howard *125 Johnson agreed to pay 8 per cent on the gross receipts up to the first $300,000 and 5 per cent on all gross receipts in excess thereof, with a guaranteed minimum annual rental of $10,000. During the year 1946 Howard Johnson paid $14,000 cash to petitioner and Goldman. Included in this $14,000 was a $10,000 advance as a security which was to be repaid 5 years later in absence of default, and $4,000 in consideration of the 1946 rental. Howard Johnson actually was repaid this $10,000 on December 12, 1951, by Henry D. Williams under the terms of the trust agreement. During the years 1947 and 1951, inclusive, Howard Johnson paid the following amounts to Williams as rental under the terms of the lease with the Vanderbilt Hotel Corporation: Year
Amount
1947
$24,758.72
1948
24,541.03
1949
23,689.72
1950
22,796.83
1951
26,245.90 ($4,417.60
advance
rental)
In each of the years 1947 to 1951, inclusive, the Vanderbilt Hotel Corporation received $7,000 in rental. This rental was the exact payment required under the lease assigned by Pappy's, Inc., to petitioner and Goldman on July 25, 1946. During the years 1947 to 1951, inclusive, Kasdin received payments *126 under the trust agreement as follows: Year
Principal
Interest
1947
$8,888.88
$3,075.32
1948
8,888.88
2,562.44
1949
8,888.88
2,347.09
1950
8,888.88
1,813.76
1951
4,444.44
695.77 These payments of principal and interest were made on a personal obligation of petitioner to Kasdin in the amount of $63,660 on the original stock purchase. The petitioner individually received the following payments under the trust agreement from the rental paid by Howard Johnson under their lease with the Vanderbilt Hotel Corporation: Year
Amount
1948
$5,145
1949
3,220
1950
3,800
The lease of July 30, 1941, assigned in liquidation by Pappy's, Inc., to petitioner and Goldman, had a fair market value of not less than $50,000 on July 25, 1946. On his 1946 income tax return the petitioner claimed a deduction of $43,922.86 as a "Loss resulting from advances to Pappy's, Inc." The claimed deduction was disallowed in its entirety. During the taxable year 1946 the petitioner was not engaged in the trade or business of making loans to corporations. In the year 1946 the petitioner sustained a nonbusiness bad debt loss in the amount of $16,222.77. *127 Opinion LEMIRE, Judge: The question presented is whether the petitioner sustained a loss in 1946 as a result of advances made to Pappy's, Inc., and whether the loss is deductible as a business or a nonbusiness bad debt. It is not disputed that the petitioner advanced funds to Pappy's, Inc., which at the time of the liquidation of the corporation in July 1946 were in the aggregate amount of $43,922.86. The respondent contends that at the time of the liquidation it had assets in excess of its liabilities and that petitioner has failed to establish that he has suffered any loss by reason of his advances to the corporation. The petitioner contends that since Kasdin had a lien upon the corporate assets for the unpaid portion of the purchase price of the shares of capital stock in the event of a liquidation of the corporation, the lease was of no value to the stockholder-creditors and, therefore, the petitioner sustained a loss in the full amount of his loans to the corporation totaling $43,922.86. We find no merit in such contention. The purchase of the capital stock and the loans to the corporation were distinct, unrelated transactions, and must be treated separately for tax purposes. *128 The liability for the unpaid purchase price of the shares of stock was the individual liability of the petitioner, while the repayment of the loans to the petitioner was a corporate liability. The losses, if any, resulting from these two separate transactions may not be commingled either for the purpose of determining the character of the loss or the amount thereof. The question we have to determine is the financial condition of the corporation at the time of its liquidation in July 1946. In our findings of fact we have set forth the statement prepared by the petitioner's auditors showing the assets and the liabilities on the date of liquidation. That statement does not reflect either the fixed assets in the amount of $50,764.44 nor any value to the lease of July 30, 1941. The fixed assets of $50,764.44 represent leasehold improvements and equipment which belong to the lessor on the termination of the lease. As the corporation was discontinuing business, we do not think the so-called "fixed assets" should be included in its assets, but should be considered in valuing the lease which was owned by the corporation at the time of liquidation. However, in determining the assets available *129 for distribution the fair market value of the lease on the date of liquidation must be established in order to ascertain the amount of petitioner's loss, if any. Each of the parties offered the testimony of a qualified real estate appraiser as to the value of the lease on July 25, 1946. Their expressed opinions differed widely. The petitioner's expert fixed the value at $10,000 and the respondent's fixed a value ranging from $50,000 to $62,000. Both experts were cross-examined at length with respect to the reasons supporting their opinions. In our judgment the testimony of the respondent's expert witness was the more persuasive and convincing. After careful consideration of all the facts, the expert opinions expressed, and giving appropriate weight to the essential factors used, in determining valuation of property, we have found as a fact that the lease in question had a fair market value of not less than $50,000 on the critical date. Including the lease at a valuation of $50,000 the total assets of the corporation were $55,068.17 and its liabilities were $13,518.04. Therefore, we have found as a fact that the petitioner sustained a loss in 1946 in the amount of $16,222.17, which *130 is computed as follows: Assets as per liquidating statement
$ 5,068.17
Add: Value of leasehold
50,000.00
Total assets
55,068.17
Liabilities assumed as per statement
13,518.04
Net assets
41,550.13
Petitioner's pro rata share, 2/3
27,700.09
Petitioner's advances to corporation
43,922.86
Petitioner's net loss
$16,222.77
Having determined that the petitioner has sustained a loss in 1946 by reason of his loans to the corporation it becomes necessary to ascertain the character of the loss. The petitioner argues that the loss is one incurred in his trade or business. His position is that he had deposited the original $25,000 as a binder on behalf of a client who had defaulted, and in order to protect the funds advanced he was required to purchase the stock. He further contends that as it was customary practice for him to deposit sums as binders for clients in his real estate operations, the original advance of $25,000, in addition to the subsequent loans to the corporation, were transactions in carrying on his real estate business and the resultant loss is deductible as a business bad debt. The difficulty, we think, with this argument is that the petitioner *131 is commingling his original investment in the capital stock with his subsequent loans. That petitioner customarily made advances for clients in order to bind a sale is of no importance in determining whether he was in the business of loaning money to corporations. We are here concerned with a loss resulting from loans by petitioner to his corporation. To give such advances the character of a business bad debt the petitioner must establish that he was in the business of advancing funds to corporations. This record is devoid of any evidence indicating that petitioner was in such a trade or business. It is well established that losses arising from loans to corporations by stockholders who are not in the business of making loans to corporations are deductible as nonbusiness bad debts. Omaha Nat. Bank, Adm. v. Commissioner, 183 Fed. (2d) 899; Jan G. J. Boissevain, 17 T.C. 325; Charles G. Berwind, 20 T.C. 808, affd. 211 Fed. (2d) 575. We hold that the petitioner in the taxable year 1946 sustained a nonbusiness bad debt in the amount of *132 $16,222.77 which is deductible under the provisions of section 23(k) (4) of the Code. Decision will be entered under Rule 50. Footnotes
*. The corporation ceased business in May 1946.↩