R. D. Wilbor, Jr., and Helen L. Wilbor v. Commissioner.
Wilbor v. Commissioner
Docket No. 60251.
United States Tax Court
T.C. Memo 1958-45; 1958 Tax Ct. Memo LEXIS 185; 17 T.C.M. (CCH) 233; T.C.M. (RIA) 58045; March 24, 1958
*185 The petitioner, R. D. Wilbor, Jr., purchased the controlling stock interest in Grand Manufacturing Company, Inc., a furniture company, during 1951, for the sum of $5,880, and shortly thereafter became its president. He devoted most of his time to its business affairs and derived his livelihood from the management thereof. During the years 1951 through 1953, inclusive, petitioner made substantial advances to said corporation in exchange for unsecured promissory notes to provide working capital for the business. When insolvency forced dissolution of the corporation in 1953, the balance of the debts owing to petitioner in the aggregate amount of $68,030 became worthless in that year. During 1953, Wilbor had also invested the sum of $1,800 in the development of a mining enterprise in return for a one-third partnership interest therein. Earlier, in 1951, he had investigated the possibility of investing money in a packing and cold storage company, and, in 1952, considered participating in the financing of a bank. Negotiations were unsuccessful in both instances and he never loaned any funds to such enterprises. As a result of the aforesaid losses sustained from the worthlessness of the *186 advances to Grand during 1953, petitioner claimed a business bad debt deduction in the taxable year 1953 under section 23(k)(1), Internal Revenue Code of 1939, and a net operating loss carry-back to the taxable year 1952. Wilbor's activities in and immediately prior to 1953 were not so extensive as to constitute a trade or business of promoting, organizing, managing, financing and making loans to businesses. Held, that petitioner is not entitled to a business bad debt deduction under section 23(k)(1) in connection with the advances to Grand since the aforesaid losses were not incurred in, or proximately related to, any separate trade or business of the petitioner. William C. Myers, Jr., Esq., 917 West Daugherty Street, Webb City, Mo., for the petitioners. Sylvan Siegler, Esq., for the respondent. FISHER
Memorandum Findings of Fact and Opinion FISHER, Judge: This proceeding involves deficiencies in income taxes determined against petitioners as follows: Year
Amount
1952
$ 609.19
1953
931.14
Total
$1,540.33
The principal issue presented for our decision is whether the worthlessness of the balance of the advances made by petitioner to a corporation, of which he was president and controlling *187 stockholder, during the taxable year 1953 is deductible in its entirety as a business bad debt under section 23(k)(1), as claimed by petitioner, or whether it is deductible as a nonbusiness bad debt within the meaning of section 23(k)(4), as determined by respondent. Findings of Fact Some of the facts are stipulated and, together with the pertinent exhibits, are found as stipulated and incorporated herein by this reference. R. D. Wilbor, Jr., and Helen L. Wilbor are husband and wife, residing in Joplin, Missouri, and filed their joint Federal income tax returns on a calendar year basis for the taxable years 1952 and 1953 with the then collector of internal revenue at Oklahoma City, Oklahoma. Helen L. Wilbor is a petitioner herein because of having joined with her husband in filing a joint return, and R. D. Wilbor, Jr., will hereinafter sometimes be referred to as the petitioner. Petitioner was employed by the United States Government for a period of more than 19 years prior to June 21, 1951, and during most of this time was employed by the Reconstruction Finance Corporation. He acted as an attorney-in-fact, assistant agency manager, and agent for subsidiaries of the Reconstruction *188 Finance Corporation. For approximately nine years he held the position of acting manger of the Reconstruction Finance Corporation at Oklahoma City, Oklahoma. For a period of about one and one-half years immediately prior to June 21, 1951, he was regional manager of the Federal National Mortgage Association. Petitioner resigned from his position with the United States Government prior to June 21, 1951, with the intention to engage in some business for himself. On June 21, 1951, he was not engaged in any trade or business. On June 21, 1951, petitioner addressed the following letter to John C. Mullins of Tulsa, Oklahoma: "June 21, 1951 "Mr. John C. Mullins Tulsa, Oklahoma
"Dear Mr. Mullins: "The following expresses the understanding reached between us today. When I have signed this letter and you have signed underneath the space marked 'ACCEPTED', it will constitute the contract between us. "1. I have agreed to pay you the sum of $5880.00 for 150 shares of the capital stock of Grand Manufacturing Company, Inc., and you have agreed to sell said stock for said sum. It is agreed that 150 shares constitutes 60% of the stock of said corporation. I herewith give you my check for the sum of *189 $5880.00 and by your signature hereon, you have acknowledged receipt of said check. "2. You have handed me a Financial Statement of Grand Manufacturing Company, Inc., dated May 31, 1951, prepared by Tom Crane, Public Accountant. You represent and warrant to me that this financial statement is correct and my obligations and undertakings as hereinabove and hereinafter expressed are based upon this representation and warranty on your part. "3. I agree to loan the Grand Manufacturing Company, Inc., the sum of $20,000.00 on the following dates: (a) $10,000.00 on or before July 15, 1951; (b) $5,000.00 on or before August 1, 1951; and (c) $5,000.00 on or before September 1, 1951. "4. It is agreed that these sums of money are to be used in the liquidation of the indebtedness of trade creditors of Grand Manufacturing Company, Inc., as shown on the statement above referred to. I am to have the full right to use my own judgment in the method and manner of liquidating said accounts, keeping in mind, at all times, that the purpose hereof is to preserve the credit of the corporation to the fullest extent possible. "5. I also agree to make available for the corporation necessary financing, if needed, *190 for the purposes of its normal operations. "6. After I have loaned the corporation the sum of $20,000.00 as above recited, you agree to re-write your present loan to the corporation so that without any payments to you, the indebtedness of the corporation to you shall be equal to my advancement, and in this connection, you likewise agree to waive your security so that the entire indebtedness owing to you and owing to me from the corporation will be un-secured. Furthermore, it is agreed that we will fix the due dates of the indebtedness to each of us so that the indebtedness will be due to us in equal amounts on the same dates. "7. I agree to devote my full time to the affairs of the corporation, beginning on or before August 1, 1951. In this connection, it is likewise understood that I am to draw a salary of $10,000.00 per year, when and as earned, but that in view of the condition of the corporation, I will not require nor take any advancements for the first sixty (60) days of operation under my control, unless, by our unanimous agreement, we feel that the corporation can afford to pay such advancement upon said account. "8. As soon as possible, we will reorganize the corporation. *191 I will become President thereof. You are to be Vice-President, and we will agree upon a Secretary-Treasurer. "Yours very truly, "s/ R. D. Wilbor, Jr. "ACCEPTED: s/ John C. Mullins" In addition to his interest in Grand Manufacturing Company, Inc., (hereinafter sometimes referred to as Grand), Mullins had an interest in an arena at Tulsa, Oklahoma, a television station in Phoenix, Arizona, and some race tracks between Arizona and Mexico. At the time the above agreement of June 21, 1951, was entered into, petitioner and Mullins reached an understanding that Wilbor would advance sums of money to Mullins' other enterprises whenever Grand no longer required the advancement of funds on petitioner's part. Petitioner at no time advanced any sums of money to any other enterprises in which Mullins held an interest. In September 1951, petitioner contacted Williams Packing and Cold Storage Company of Miami, Oklahoma, with a view toward possible investment of funds in said firm. Ensuing negotiations were not fruitful and petitioner never invested any money in that company. Likewise, during the latter part of 1952, petitioner contacted certain unnamed individuals in Decatur, Arkansas, who were considering *192 the establishment of a bank in the vicinity of Decatur. These individuals insisted on retaining control of the stock of their enterprise, and petitioner thereupon lost interest in the venture and never invested any money therein. In 1953, petitioner became a member of a three-man partnership engaged in the development of certain wildcat mining enterprises. The partnership held several mineral leases, and was financially unable to develop them. Petitioner agreed to advance funds for the payment of a lease rental and for the purchase of supplies and equipment, in return for a one-third partnership interest in any ore that was received. The other two partners contributed personal services. During the taxable year 1953, petitioner invested approximately $1,800 in the partnership, and up to the time of the trial he was still advancing funds to this enterprise. His participation in said partnership required very little of his time. Grand Manufacturing Company, Inc., was a manufacturer of furniture. Prior to June 21, 1951, petitioner had had no familiarity with the business of manufacturing furniture, and had never been employed by a manufacturer of furniture. Grand had an authorized capital *193 of $25,000, consisting of 250 shares of common stock of a par value of $100 per share. The authorized capital stock was issued to Mullins in exchange for $500 in cash and other property having a value of $24,500. In accordance with the terms of his agreement with Mullins, set forth hereinabove, petitioner purchased from Mullins 150 shares of the capital stock of Grand at a price of $5,880. Some time after June 21, 1951, petitioner assumed the duties of president of Grand, and in September 1951, he began to draw the agreed salary as president of the corporation. Pursuant to the provisions of paragraph 3 of the agreement of June 21, 1951, petitioner advanced to Grand the sum of $10,000 prior to July 15, 1951; the additional sum of $6,700 prior to August 1, 1951; and the additional sum of $10,000 prior to September 1, 1951. All of these amounts were deposited in the corporation's bank accounts at the Fourth National Bank, Tulsa, Oklahoma, and the State Bank of Grove, Oklahoma. Between July 9, 1951, and December 31, 1951, petitioner advanced to Grand sums of money totaling $47,200. During the taxable years 1952 and 1953, petitioner advanced to Grand sums of money totaling $14,158.58 and *194 $3,530, respectively. The major portion of these amounts was also deposited in the corporation's two bank accounts. During the taxable year 1953, the corporation credited to the account of petitioner unpaid salary in the total amount of $7,900. On July 31, 1951, petitioner transferred to Grand a new automobile owned by his wife, and by reason of such transfer the corporation credited petitioner's account with the sum of $3,300. On July 2, 1953, the automobile transferred to Grand was transferred back to petitioner, and the corporation debited petitioner's account in the amount of $1,500 therefor. During the taxable years 1952 and 1953, the corporation also debited petitioner's account by reason of cash payments made to or on behalf of petitioner and the transfer of inventory items to petitioner. During 1952 and 1953, the debits to petitioner's account aggregated $358.58 and $10,064.67, respectively. Net advances shown by the books of the corporation to have been made by petitioner to Grand during the years 1951, 1952, and 1953, amount to $50,000, $13,800 and $1,365.33, respectively, or an aggregate of $65,665.33. Said amounts advanced by petitioner to Grand were intended to be used *195 for working capital. For the amounts advanced, unsecured promissory notes were issued by the corporation to petitioner. The corporation sustained a net loss of $23,620.73 for the taxable year beginning April 1, 1951, and ending March 31, 1952, and a net loss of $17,164.63 for the taxable year beginning April 1, 1952, and ending December 31, 1952. During the taxable year 1953, receivership proceedings were initiated against Grand and a receiver was appointed. On the basis of an audit of the corporation's financial condition conducted in 1953, it was determined that in June 1951, its liabilities were in excess of corporate assets. Wilbor was not aware of the fact that Grand Manufacturing Company, Inc., was insolvent on June 21, 1951. He believed that the company was solvent and that the current assets equaled the current liabilities on that date. Some time during the taxable year 1953, petitioner concluded that the corporation was unable to pay the notes which it had issued to him. Petitioner thereafter left these notes with his wife and his sister as collateral for undisclosed amounts of money which he had borrowed from them. On their joint Federal income tax return for the taxable *196 year 1953, petitioners reported salary from Grand in the amount of $7,200 and other income of $439.30. Petitioners claimed a long-term capital loss of $5,880 on account of the worthlessness of the 150 shares of the corporation's stock, and a bad debt loss of $68,030 on account of the worthlessness of the corporation's notes. Petitioners applied $1,000 of the claimed capital loss and $4,407.87 of the claimed bad debt loss against total income. On their joint Federal income tax return for the taxable year 1952, petitioners reported salary from Grand in the amount of $6,500 and other income of $533.23, and paid income tax of $609.19 with respect to such amounts. During the taxable year 1954, petitioners filed an application for a tentative carry-back adjustment with the district director of internal revenue, and requested therein that $2,744.44 of the unused bad debt loss claimed on the 1953 income tax return be applied against the income reported for the taxable year 1952. The filing of this application resulted in a refund to petitioners of $609.19 paid as income tax for the taxable year 1952. In the notice of deficiency, respondent determined that the notes of Grand which became worthless *197 during the taxable year 1953, represented nonbusiness debts under section 23(k)(4), Internal Revenue Code of 1939, and that since petitioners had been allowed a deduction of $1,000 on account of the worthlessness of the 150 shares of the corporation's stock, no further deduction on account of the worthlessness of the notes was allowable. The operating loss in the amount of $4,407.87 claimed for the taxable year 1953 was accordingly disallowed and deficiencies were determined for each of the taxable years 1952 and 1953. The petitioner in 1953 was not engaged in the trade or business of promoting, managing, financing or making loans to businesses. No part of the $68,030 advanced by petitioner to Grand represents a debt, the loss from the worthlessness of which was incurred in a trade or business regularly carried on by petitioner. Opinion The respondent, in his statutory notice, determined that petitioner had made certain advances to Grand Manufacturing Company, Inc., the net amount of which, $68,030, represented by unsecured promissory notes, became worthless during the taxable year 1953, and that such advances represent a nonbusiness debt under section 23(k)(4), to be treated as a *198 short-term capital loss. [1] *199 Respondent also contended, at the trial and on brief, as an alternative argument, that said advances to Grand were contributions to capital. Contesting respondent's determination on either theory, petitioner avers that the aforesaid advances represented bona fide loans made by him to Grand during the years 1951 through 1953, inclusive, as part of his "new business" of regularly contributing time and money in acquiring, exploiting and expanding various enterprises, and that he is therefore entitled to deduct the worthless loans in full as a business bad debt under section 23(k)(1), and also that, as a consequence, he is entitled to a net operating loss carry-back to 1952. At the outset, we note that if, as respondent contends, the advances to the corporation either resulted in a nonbusiness debt or were additional contributions to capital, they would, on worthlessness, give rise to a loss subject to the statutory limitations provided in sections 23(g) and 117 of the 1939 Code with respect to capital losses and the tax result to petitioner under either category in the circumstances of the instant case would be the same. [2] *200 *201 Thus, under either view, the amount of $1,000 allowed on the 1953 income tax return on account of the worthlessness of the 150 shares of stock held by petitioner would represent the full deduction to which petitioner would be entitled for that year. Section 39.23(k)-6, Regulations 118. [3] Assuming, arguendo, as urged by petitioner, that the advances in question represented bona fide loans rather than risk capital, we hold, nevertheless, for the reasons hereinafter stated, that such loans (which both parties agree became worthless in 1953) are not deductible as business bad debts within the meaning of section 23(k)(1). It is well established that an individual, to be entitled to deduction of a business bad debt, must show that the loss resulting from the debt's becoming worthless bears a proximate relation to a trade or business in which he was engaged in the year *202 in which the debt became worthless. "Business debt" is defined only by negative implication from subsection (4) of section 23(k), providing that "the term 'non-business debt' means a debt other than a debt evidenced by a security, as defined in paragraph (3) and other than a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business." The interpretative regulations, Regulations 118, section 39.23(k)-6 (derived from H. Rept. No. 2333, 77th Cong., 2d Sess., p. 76; 1942-2 C.B. 431), provide, in pertinent part, as follows: "A non-business debt is a debt, other than a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business and other than a debt evidenced by a security as that term is defined in section 23(k)(3). The question whether a debt is one the loss from the worthlessness of which is incurred in the taxpayer's trade or business is a question of fact in each particular case. The determination of this question is substantially the same as that which is made for the purpose of ascertaining whether a loss from the type of transaction covered by section 23(e) is 'incurred in trade or business' under paragraph (1) *203 of that section. "(b) The character of the debt for this purpose is not controlled by the circumstances attending its creation or its subsequent acquisition by the taxpayer or by the use to which the borrowed funds are put by the recipient, but is to be determined rather by the relation which the loss resulting from the debt's becoming worthless bears to the trade or business of the taxpayer. If that relation is a proximate one in the conduct of the trade or business in which the taxpayer is engaged at the time the debt becomes worthless, the debt is not a non-business debt for the purpose of this section." See Hickerson v. Commissioner, 229 Fed. (2d) 631, 633 (C.A. 2, 1956), affirming a Memorandum Opinion of this Court, T.C. Memo. 1954-237 [13 TCM 1180], and holding the above cited regulation to be valid. Although Congress did not define the term "trade or business," it made it clear in the committee reports that this concept was not intended to encompass all activities engaged in for profit, but was used in the realistic and restricted sense of a going trade or business. See Commissioner v. Smith, 203 Fed. (2d) 310 (C.A. 2, 1953), certiorari denied 346 U.S. 816. The question *204 whether a taxpayer's activities constitute the carrying on of a trade or business, so that bad debts proximately related therewith may be deducted in full, is essentially a question of fact, requiring an examination of the particular facts in each case. Jan G. J. Boissevain, 17 T.C. 325 (1951); Robert Cluett, 3d, 8 T.C. 1178 (1947); Regulations 118, section 39.23(k)-6. On this issue, petitioner has the burden of proof. It is clear, at the outset, that the business of a corporation is not considered to be the business of its stockholders or officers. Cf. e.g., Burnet v. Clark, 287 U.S. 410 (1932); Dalton v. Bowers, 287 U.S. 404 (1932); Deputy v. Du Pont, 308 U.S. 488, 493-494 (1940); Hadwen C. Fuller, 21 T.C. 407 (1953); and Estate of William P. Palmer, Jr., 17 T.C. 702 (1951). At the same time, we recognize, of course, that a worthless debt, resulting from a loan by a stockholder or corporate executive to a corporation may qualify as a business bad debt, if the taxpayer was in reality engaged in the business of promoting, organizing, managing, financing, or making loans to business enterprises if the loss is proximately related to such business. Henry E. Sage, 15 T.C. 299 (1950); *205 Vincent C. Campbell, 11 T.C. 510 (1948). On the other hand, as we pointed out in Charles G. Berwind, 20 T.C. 808, 815 (1953), affirmed per curiam 211 Fed. (2d) 575 (C.A. 3, 1954), the rule stated in such "promoter" cases as those cited above is "applicable only to the exceptional situations where the taxpayer's activities in promoting, managing, and making loans to a number of corporations have been regarded as so extensive as to constitute a business separate and distinct from the business carried on by the corporations themselves." See also Langdon L. Skarda, 27 T.C. 137, 148 (1956), affirmed 250 Fed. (2d) 429 (C.A. 10, 1958); Samuel Towers, 24 T.C. 199, 212 (1955), affirmed 247 Fed. (2d) 233 (C.A. 2, 1957), certiorari denied 355 U.S. 914; Wheeler v. Commissioner, 241 Fed. (2d) 883 (C.A. 2, 1957), affirming Memorandum Opinion of this Court, T.C. Memo. 1955-138 [14 TCM 509]; and Hadwen C. Fuller, supra. Petitioner argues that he was in the business of financing, promoting, organizing and making loans to various business ventures, and that his activities, therefore, come within the principles announced in the "promoter" cases referred to above. We are of the opinion that *206 petitioner's position is without merit for the reasons set forth below. Petitioner agrees that from the time he resigned his position with the Government until June 21, 1951, he was not in any business at all. Under date of June 21, 1951, petitioner addressed the letter to John C. Mullins (which is set out in extenso in our Findings) and Mullins accepted the proposition. We think it is clear that petitioner did not thereby embark upon or engage in the business of promoting, managing, financing, or making loans to corporations or business enterprises. In the first place, in paragraph 7 of the letter, petitioner agreed to devote his full time to the affairs of the corporation, beginning on or before August 1, 1951. While it appears that he did not in fact find it necessary to devote all of his time to the corporation's affairs, it was his intention to do so, and his own proposal negatives any then existing intent to carry on a separate business of his own. Moreover, his salary was fixed by the agreement, and it was contemplated that he would become president of the company. These arrangements were significant factors in relation to his buying into the corporation and were integrated *207 with his plan to purchase stock and his agreement to lend money to the company. There is nothing in the record to indicate that he would have bought the stock without the contemporaneous agreement for his employment as an officer at a substantial salary. There is likewise nothing to indicate that Mullins would have agreed to the employment or salary without the purchase of the stock by petitioner or petitioner's agreement to lend money to the company. It is apparent, also, that it would have been futile for petitioner to purchase the stock, or to attempt to assure his employment, unless he was willing to lend the company enough money to take care of its trade debts and normal operating needs. Thus, as already indicated, there is no substantial basis for the conclusion that petitioner was entering upon, or establishing, a separate business of his own (distinct from that of the corporation) consisting of the promoting, managing, financing, or making loans to other businesses. To the contrary, it was his express intent to buy stock of the particular company, lend it money, and devote his full time to it as a salaried officer in an integrated transaction unrelated to any distinct business *208 of his own. We do not think the vague understanding with Mullins that petitioner would at some later date advance money to other enterprises of Mullins in any way alters the views above expressed. It is also apparent that the fruitless contacts with Williams Packing and Cold Storage Co. of Miami, Oklahoma, in September 1951, and with unnamed individuals in Decatur, Arkansas, in 1952, referred to in our Findings did not reach the status of a business as far as petitioner was concerned. In 1953, petitioner became a partner in a three-man partnership engaged in the development of certain wildcat mining enterprises. As consideration for his one-third partnership interest, petitioner agreed to advance funds to pay rentals and to purchase supplies and equipment, while the other two partners were to furnish personal services. In 1953, petitioner invested about $1,800 in this enterprise, and continued thereafter to make advances. We see nothing in the picture differing from the action of any partner in meeting his obligation as such, and nothing to indicate that petitioner's acts were a part of some over-all business, separate from that of the partnership, of promoting, financing, managing *209 or making loans to corporations or business enterprises. Petitioner himself testified that he devoted "very little" time to the mining enterprise. We have mentioned separately and in turn each of the activities upon which petitioner relies. Considering them in the aggregate as well, we hold that they do not support the view that petitioner's activities were so extensive as to constitute a business of his own, separate and distinct from the two businesses in which he participated as an officer of a corporation in the one instance, and as a partner in the other, within the principles established in Charles G. Berwind, supra, and other related cases already cited. See also Dominick J. Salomone, 27 T.C. 663 (1957); A. Kingsley Ferguson, 16 T.C. 1248, 1257 (1951)
In support of the view that he was in the business of organizing, promoting and financing business enterprises, petitioner relies heavily upon Giblin v. Commissioner, 227 Fed. (2d) 692 (C.A. 5, 1955). We think Giblin is clearly distinguishable from the instant case. In Giblin, the taxpayer on 11 or 12 occasions between the years 1926 and 1945 had regularly contributed time, talent and money to the exploitation of ideas to make *210 money apart from his law practice, lending such aid to these enterprises as he considered would best accomplish that purpose. Unlike the instant case, where petitioner agreed to become a full-time salaried officer of a corporation (in addition to buying stock and making loans or advances) and about two years later acquired a partnership interest in a mining enterprise to which he admittedly devoted very little time, in Giblin, the taxpayer's promotional activities were separate, extensive and time-consuming. See Hickerson v. Commissioner, supra, ( at page 633) and Pokress v. Commissioner, 234 Fed. (2d) 146, 150 (footnote 12) (C.A. 5, 1956), affirming Memorandum Opinion of this Court, T.C. Memo. 1954-128 [13 TCM 805,]. Petitioner likewise relies upon Vincent C. Campbell and Henry E. Sage, both supra. In Campbell, supra, the taxpayers owned and operated 12 corporations engaged in the retail coal business. It was their practice as a part of their business to advance to, or leave with, those corporations on open accounts money belonging to them. The taxpayers made loans to one of the corporations which became worthless in 1944. We held that the bad debts were a direct result of, and *211 incurred in, the taxpayer's business of organizing and operating numerous corporations engaged in the retail coal business. We think it quite apparent in that case that the practice of making advances to such corporations, and other promotional activities of taxpayers were a part of a separate and extensive business. No like facts are here present. In Sage, we found as a fact that the procedure followed by the taxpayer of investing his money in a venture and then devoting his time and energy to make it succeed was used by him with such frequency and regularity that it amounted to a regular business carried on by him. Hence, when a loan to one of his business ventures became worthless, we held that it was fully deductible by him as a business bad debt. In so holding, we emphasized that his ventures were "many and varied." It is clear that the case has no application here, since petitioner has not shown that his activities in promoting, financing, managing, and making loans to corporations or business enterprises were sufficiently extensive in and around 1953 to constitute a separate trade or business within the intendment of the rule heretofore stated. In the light of the foregoing *212 discussion, we think it clear that petitioner has failed to meet the burden of proving that respondent erred in determining that the worthless loans or advances here in issue were nonbusiness bad debts. We think the record clearly supports the view that they were not business bad debts and that petitioner was not in a business in or of itself consisting of promoting, organizing, managing, financing or making loans to other businesses. See Burnet v. Clark, supra; Samuel Towers, supra; Wheeler v. Commissioner, supra.See also Omaha National Bank v. Commissioner, 183 Fed. (2d) 899 (C.A. 8, 1950), affirming a Memorandum Opinion of this Court, dated September 20, 1949 [8 TCM 863,], where, as in the instant case, the taxpayer, who was a stockholder-officer of a corporation engaged in the restaurant business, advanced a total of $23,000 in 18 separate loans, evidenced by unsecured promissory notes, to said corporation which became bankrupt. The Court of Appeals held in that case that the loans were not made to further any independent promotional business of the taxpayer. Respondent argues, in the alternative, that petitioner's advances to Grand during 1953 constituted a contribution *213 to capital rather than loans. We need not consider this alternative view because we have held that in any event the loss is not deductible as a business bad debt under section 23(k) (1). The practical result under the circumstances of the instant case would be the same whether we considered that the advances constituted a nonbusiness bad debt or a contribution to capital. In either circumstance, respondent would be affirmed, and we so hold. It is apparent from our prior discussion that the loss in question was not attributable to the operation of a business regularly carried on by petitioner, and, therefore, that a net operating loss carry-back to the taxable year 1952 is not available to him under sections 23(s) and 122(d)(5). Respondent's disallowance thereof is therefore sustained. See Irving Rothbart, 26 T.C. 680, 689 (1956); Joseph Sic, 10 T.C. 1096 (1948), affirmed 177 Fed. (2d) 469 (C.A. 8, 1949), certiorari denied 339 U.S. 913. Decision will be entered for the respondent. Footnotes
1. Internal Revenue Code of 1939. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(k) Bad Debts. - (1) General rule. - Debts which become worthless within the taxable year; * * * This paragraph shall not apply in the case of a taxpayer, other than a corporation, with respect to a non-business debt, as defined in paragraph (4) of this subsection * * *
(4) Non-business debts. - In the case of a taxpayer, other than a corporation, if a nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. The term "nonbusiness debt" means a debt other than a debt evidenced by a security as defined in paragraph (3) and other than a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. * * *↩
2. SEC. 23. DEDUCTIONS FROM GROSS INCOME. * * *
(g) Capital Losses. - (1) Limitation. - Losses from sales or exchanges of capital assets shall be allowed only to the extent provided in section 117. (2) Securities becoming worthless. - If any securities (as defined in paragraph (3) of this subsection) become worthless during the taxable year and are capital assets, the loss resulting therefrom shall, for the purposes of this chapter, be considered as a loss from the sale or exchange, on the last day of such taxable year, of capital assets. (3) Definition of securities. - As used in paragraph (2) of subsection the term "securities" means (A) shares of stock in a corporation, and (B) rights to subscribe for or to receive such shares. SEC. 117. CAPITAL GAINS AND LOSSES. * * *
(d) Limitation on Capital Losses. - * * *
(2) Other taxpayers. - In the case of a taxpayer, other than a corporation, losses from sales or exchanges of capital assets shall be allowed only to the extent of the gains from such sales or exchanges, plus the net income of the taxpayer of [or] $1,000, whichever is smaller. For purposes of this paragraph, net income shall be computed without regard to gains or losses from sales or exchanges of capital assets. If this tax is to be computed under Supplement T, "net income" as used in this paragraph shall be read as "adjusted gross income." 3. Section 39.23(k)-6. Nonbusiness bad debts. (a) In the case of a taxpayer, other than a corporation, if a nonbusiness bad debt becomes entirely worthless within the taxable year, the loss resulting therefrom shall be treated as a loss from the sale or exchange of a capital asset held for not more than six months. Such a loss is subject to the limitations provided in section 117↩ with respect to gains and losses from the sale and exchange of capital assets. * * *