H. BEALE ROLLINS AND MARY E. ROLLINS, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 69941. Filed June 10, 1959.

*Morris Fedder, Esq.*, for the petitioners.
*William Schwerdtfeger, Esq.*, for the respondent.

DRENNEN, *Judge:* Respondent has determined deficiencies in petitioners' income tax for the years 1952, 1953, and 1954 in the amounts of $11,362.24, $34,854.04, and $6,538.84, respectively.

The sole issue in respect to 1952 is whether the loss suffered from the worthlessness of a loan of $20,000 made to Manufacturers Research Corporation should be treated as a business or nonbusiness bad debt. In respect to 1953, the questions are: (1) Whether losses resulting from advances totaling $111,969.60 to Associated Buck Canning Machines, Inc., were sustained during 1953; (2) if so, whether

such advances constituted loans or contributions to capital; and (3) if found to be loans, whether the losses sustained therefrom are to be treated as business or nonbusiness bad debts. The year 1954 is involved only as a result of an operating loss carryover arising out of the 1953 loss. Two additional and unrelated issues during these years have been conceded by petitioners.

FINDINGS OF FACT.

Some of the facts are stipulated and are hereby found as stipulated.

H. Beale Rollins, hereinafter referred to as petitioner, and Mary E. Rollins, husband and wife, residing in Baltimore, Maryland, filed their joint income tax returns for the calendar years involved with the district director of internal revenue at Baltimore, Maryland. Since 1925, petitioner has been engaged in the active practice of law in Baltimore, Maryland, and as an independent insurance investigator and adjuster.

During 1950, the Manufacturers Research Corporation, of which Louis A. Scholz was principal stockholder, had contracted to manufacture 47 special identification cameras for the United States Air Force. After failing in an attempt to negotiate a bank loan, Scholz, at the suggestion of a banker, approached petitioner in an effort to interest the latter in financing the contract. Petitioner agreed to loan the corporation $20,000, which was subsequently advanced in four installments of $5,000. For each, petitioner received debenture notes which were convertible at his option into common stock of the corporation. In 1952, the Air Force declared the contract to be in default and on November 6, all of the corporation's assets were sold. The proceeds were not enough to satisfy the claims of small judgment creditors, and, as a result, petitioner's loan or investment of $20,000 became worthless in 1952.

In 1947, petitioner was approached for financial help by Benjamin I. Buck, a former client. Buck, an inventor of food processing machinery, who had, prior to 1947, secured patents on bean snipping machines, graders, slicers, and conveyors, all of which were licensed to the Food Machinery Corporation on a royalty basis, was in need of funds to carry through the development and patenting of a recently designed tomato-skinning and -canning machine. Although petitioner at that time expressed little interest in the project and did not wish to become involved, he did arrange to have his wife advance $4,200 to Buck on a note payable in annual installments of $1,000.

Despite Buck's royalties and employment as a mechanic, he could not meet the first installment on the note held by petitioner's wife. In October 1948, he renewed his efforts to interest petitioner in financing the tomato-skinning machine. Petitioner finally agreed to advance $10,000 for development and production of the machine and the ob-

taining of a patent, and on March 18, 1949, entered into a contract with Buck providing for the advance, and at the same time an assignment by Buck to petitioner "of an undivided one-half interest in and to all patents now held by the said Buck of every kind, nature and description, including any and all patents hereinafter granted the said Buck." The agreement also provided for the formation of a corporation "with the capital to be advanced by the said Rollins, said capital not to be in excess of * * * $10,000 and to be in the nature of debenture bonds." Buck and petitioner were each to own one-half of the common stock, which was to be restricted as to alienation so that neither could own more than one-half of the shares without the consent of the other. Buck, as president of the corporation, was to devote his entire time to the perfection of the patent and the production of the machine, and, also, to receive a salary of $100 per week. Furthermore, all royalties received by Buck under his licenses to the Food Machinery Corporation were to be assigned to the new corporation.

On November 29, 1949, Buck executed the assignment to petitioner of a one-half interest in his patents, including an application for a patent pending on the tomato skinner, and on March 20, 1950, he assigned a one-half interest in a patent application on improvements to the skinning machine, which assignments were duly recorded in the United States Patent Office. The corporation contemplated by the agreement of March 18, 1949, was not formed until May 19, 1950. During this interim period petitioner advanced to Buck, individually, $10,000, and upon its exhaustion, an additional $9,719.01, for a total of $19,719.01; from his royalty income Buck repaid $2,507.25, leaving a balance of $17,211.76.

Associated Buck Canning Machines, Inc., hereinafter referred to as "Associated," was incorporated under the laws of Maryland on May 19, 1950, with Buck and petitioner serving as two of the three directors and in the positions of president and secretary-treasurer, respectively. The corporate charter provided that the capital stock would be issued to Buck and petitioner in exchange for a license to manufacture and sell the tomato-skinning machine under applications for patents owned by them. Although the officers were authorized at the first meeting of the board of directors to show on all reports that the stock had been issued and was outstanding, it was agreed, at petitioner's insistence, that the stock would not be issued until he had been reimbursed for all sums transferred to Buck and Associated. Furthermore, the directors agreed that since the money theretofore advanced to Buck had been spent on behalf of the machine in which the company was now primarily interested, that the outstanding balance of $17,211.76 was to be assumed as a liability of the corporation and that Buck was to be released from personal liability for this sum. (The assumption of

liability and release did not encompass the $4,200 advanced by petitioner's wife in 1947, which amount is not here in issue.)

Following the formation of Associated, petitioner transferred additional sums of money to it periodically in amounts varying from $126.95 to $6,000; between May 26, 1950, and September 18, 1953, petitioner's advances to the corporation totaled $97,475.53, of which $2,717.69 was returned to him. Adding the $17,211.76 transferred to Buck and assumed by Associated, the advances outstanding on September 18, 1953, amounted to a net of $111,969.60. No portion of this sum was evidenced by notes or other obligations of Associated; the advances were not secured by collateral and did not bear interest. Associated never issued bonds or its capital stock.

At several points during this period petitioner had expressed his concern over the lack of success in Buck's efforts to perfect the machine and the large sums of money that were being consumed. The investment on the part of Buck, who was substantially without assets, amounted to $5,000, which represented 2 years of royalties on other patents used in this business. All of the funds were consumed by the corporation in its operation about as fast as they were made available, primarily on rent, salaries, travel, parts, and machine work.

In May 1951, when petitioner had transferred a total of approximately $66,000, he stated his desire to withdraw from the project. At a meeting of the board of directors of the corporation Buck disclosed that he was negotiating with another individual who might be willing to put up $80,000 for an interest in the corporation. An amendment to the corporate charter permitting this individual to purchase stock was agreed to, but the latter lost interest and the deal never materialized.

In 1952, a pilot model of the machine was tested by one Stout, the chief engineer of Stokely-Van Camp Company, a large canning concern. Although the machine had not yet been developed to a satisfactory state, the engineer's report was optimistic in respect to its possibilities and petitioner agreed to continue to advance additional funds for further development.

Lacking positive results by the end of the 1952 canning season, petitioner and Buck reached an understanding that petitioner would continue to support the effort only through the end of the 1953 canning season, and if by that time an acceptable machine had not been produced, everything was to be sold, including Buck's existing patents, and petitioner was to be repaid the amounts advanced to the corporation. A letter reflecting this understanding was prepared and sent by Buck to petitioner. Buck's continuing efforts in 1953 to perfect the machine resulted in certain refinements, which he decided to test on a machine located in a factory in Canada. Returning from this trip on September 17, 1953, Buck and two other employees of

Associated were killed in an automobile accident. Petitioner was appointed executor of his estate.

The death of Buck left four employees of the corporation familiar with the development and operation of the machine, one of whom was Buck's son. Within a week after Buck's death, his son and son-in-law, with $500 advanced by petitioner, traveled to one of the machines located in Ohio in a further attempt to adapt and perfect the refinements which Buck had unsuccessfully tested in Canada. This effort also proved to be unsuccessful. Buck's son, however, continued to believe that the machine had possibilities and found support in this view in Elmer Wilmer, a machine shop owner and former employee of Associated who had constructed one of the early models. Early in 1954, Wilmer advised the son that for about $10,000 more the machine could be perfected. Notwithstanding the enthusiasm of these two, all further developmental work was dropped due to a lack of funds. Petitioner refused to advance any additional money.

Under date of October 20, 1953, petitioner dispatched letters to about a dozen canning machine manufacturers soliciting their interest in purchasing the machine and all of Buck's patents. The letters pointed out that:

The tomato peeler has just about been brought to its final development state, although some little additional engineering is needed to put the tomato skinner in a place where it will be commercially acceptable.

In response to one of the replies, petitioner in a second communication to the company on February 3, 1954, expressed the view that "[b]oth the bean nipper and the tomato peeler have great possibilities and I do not think there is too much additional development needed on the tomato peeler. * * * These machines could be sold at a good profit." Ultimately, all of the manufacturers disclaimed interest in the machine and the other patents.

Additional interest in the potentialities of the machine, however, was manifested early in 1954 when C. A. Shuttleworth, of Shuttleworth Foods, Inc., who had a $2,000 deposit on one of the tomato-skinning machines, requested petitioner's permission to send the machine to the F. H. Langsenkamp Company for their testing and additional developmental effort. With petitioner's permission, Shuttleworth on February 11, 1954, wrote F. H. Langsenkamp, Jr., that on the basis of his experience with the machine he felt that it had "possibilities," and since the machine and further development could be taken over now "on the best possible terms," he would suggest that Langsenkamp look into it. Petitioner, in September 1954, pursued the matter further by arranging a meeting with Langsenkamp in the latter's Indianapolis office, at which time it was agreed that petitioner would ship a machine to Langsenkamp for further tests and work. The machine that was shipped has remained there without further development through the time of the hearing of this case.

The application for a patent on the tomato-skinning machine had originally been filed by Buck on November 5, 1946. Since then 6 additional patent applications with respect to the machine were filed, 4 of them after Buck's death; patents on all 6 were subsequently issued during 1955 and 1958, in each instance to petitioner, individually, and also as executor of Buck's estate. Assignments of a one-half interest in these various patents to petitioner were executed by Buck prior to his death and on February 23, 1955, and October 22, 1956, by petitioner, as executor of Buck's estate, to himself, individually.

At the time of the hearing of this case, approximately 5 years after the death of Buck, the latter's estate had not yet been settled. By petition notarized on February 28, 1956, petitioner requested that the Orphans' Court of Baltimore City grant him an extension of time within which to file an inventory of assets. Therein petitioner informed the court that the assets of the estate consisted "only of a possible interest in Royalties on Patents" owned one-half by petitioner and one-half by deceased; that in the last year of his life Buck had assigned to petitioner the one-half interest owned by Buck as security for "monies advanced * * * to the Decedent * * * upwards of * * * $115,000.00 in cash"; that since Buck's death petitioner had collected approximately $5,000 in royalties, one-half of which petitioner owned outright and the other half of which he was entitled to by virtue of the assignment. Petitioner further advised the court that he "has made diligent efforts to sell the Patents and the Royalty right therefrom for an outright figure; that your Petitioner feels if he is granted an additional six months in which to file his Account some final conclusion may have been reached, perhaps to the interest of the heirs at law." The extension was granted by the court.

Except for royalties of about $7,000, collected by the estate between 1953 and 1957, and the patent rights to the tomato skinner, the assets of Buck's estate consisted only of travelers checks and an insurance policy aggregating in value about $1,000.

According to petitioner's income tax returns for 1952 and 1953, his largest single source of income was derived from the practice of law as a partner in the firm of Rollins, Smalkin, Goudy & Weston. The major portion of the remaining income was derived from salaries from four of his trucking corporations. In 1952, he reported no income from interest, and in 1953, $1,565.68 in interest.

Apart from the two ventures just detailed, losses in respect to which are here in issue, petitioner had participated over a period of 30 years prior to 1953 in a number of business ventures. The history of his activity, as we have been able to piece it together from petitioner's rather generalized testimony, is briefly summarized in the chart following:

| Year | Name of enterprise | Type of business | Petitioner's interest | | "Advances" (A) or loans guaranteed (G) | Income through 1953 | |
|---|---|---|---|---|---|---|---|
| | | | Nature | Amount | | Salaries and fees | Partnership profits |
| Early 1920's | Demolition project | Performance of a contract to raze 2 buildings. | Joint venture | $1,500-25% | None | | (Loss) |
| 1925—for 6 months | Toy, card, gift shop | | Partnership | $500-50% | None | | None |
| 1927—for 3 summer seasons. | Rapids Co.—(concessions at Carlin's Amusement Park). | Construction and operation of 2 amusement park rides. | Partnership | $?-33⅓% | None | | Unknown |
| 1935-38 | Downtown Motors, Inc. | Ford agency in Baltimore. | Stockholder | $10,000-? (4 others participated). | {(A)$3,000 / (A)$2,000} [1] | (Loss—Bankruptcy) | |
| 1938-44 or 1945 | Brooklyn Motors | Ford agency in Baltimore. | [Partnership] [2a] | [$?-33⅓%] [2a] [2b] | (A)$30,000 | | [$29,975] [2a] |
| 1942-50 | Air Brakes & Controls | Bendix-Westinghouse distributorship. | Stockholder [3] and partner. | $4,000-25% | {(?)$30-$0,000 / (G)$30,000} | | $59,141 |
| 1945-X* | Atlanta-New Orleans Motor Freight Company (ANO). | Trucking line. | Stockholder—officer/employee. | $11,250-25% [4] | (?) Unknown | $62,026 | |
| 1945-X | Johnson Motor Lines, Inc. (JML). | Trucking line. | Partner [5a] Stockholder—officer/employee. | See footnote [5a] [5b] | {(A) See footnote [5a] / (G)$60,000} | 24,499 | |
| 1947-1947 | Transportation Bureau of Baltimore. | Consultants to trucking carriers and shippers. | Stockholder [6] | $2,750-33⅓% [6] | None [6] | None | |
| 1948-X | Melton Tire Co., later changed to Mecklinburg Tire Co. | Supplier of tires to JML and others. | Stockholder | $5,000-50% [7a] [7b] | (G)$10,000 [7a] | None [7b] | |
| 1948-X | Wanda Realty Company, Inc. | Erection of Baltimore terminal for JML. | Stockholder | $100-50% [8] | (G)$75,000 | None | |
| 1948-X | Mobile Realty, Inc. | Erection of Mobile, Alabama, terminal for ANO. | Stockholder | $1,000-33⅓% [9] | {(A)$22,000 / (G)$78,000} | None | |
| 1948-1948 | Atlantic Equipment and Manufacturing Co. | Assembled highway freight trailers. | Stockholder—officer/employee. | $500-50% | (G)$5,000 | $500 | |
| 1949-X | Motor Equipment & Service, Inc. | (?) | Stockholder | $?-? | None | None [10] | |
| 1950-1951 or 1952 | Safety-Lights, Inc. | Marketing chestlights and flashlights. | Stockholder | $?-? [11] | (A)$7,000 | None | |
| 1951-X | Georgia Interstate Realty | Erection of terminal for ANO. | Stockholder | $200-25% | {(A)$60,000 / (G)$200,000} | None | |

| | | | | | | |
|---|---|---|---|---|---|---|
| 1951-X | Equipment Leasing, Inc. | Leasing of tractors and trailers to ANO and JML. | Stockholder—officer/ employee. | $100-83⅓%¹² | (A)$18,250 | $12,250 |
| 1951-X | Highway Service, Inc. | Maintenance and garaging for ANO. | Stockholder—officer/ employee. | $1,350-25%¹³ᵃ | [(A)$20,000]¹³ᵇ | 500 |
| 1951-X | United Equipment & Service, Inc. | Maintenance and servicing of JML equipment. | Stockholder—officer/ employee. | $6,295-40%¹⁴ | (7)$238,000 | 4,300 |
| 1952-X | Atlantic Terminals and Warehouses, Inc. | Erection of terminals and warehouses for JML. | Stockholder. | $6,295-?¹⁵ | (G)$200 | None |

\* Denotes petitioner's continued participation through 1953 and years following.

[ ] denotes investment by petitioner's wife rather than petitioner.

1 This $2,000 was advanced under the name of petitioner's wife rather than by petitioner.

2a The one-third interest in this partnership was held by petitioner's wife rather than by petitioner and she realized this income; the advances, however, were made by petitioner himself.

2b There is no evidence that any capital was contributed by any of the partners, including petitioner's wife.

3 This business was conducted in corporate form until December 31, 1942, when it was dissolved; and thereafter the business continued as a partnership.

4 Petitioner increased his interest in 1950 to 48 per cent by purchase, and in 1956 to 81 per cent by purchase of the entire interest of J. N. Johnson from his estate.

5a This trucking line was originally purchased by petitioner's "partner," J. N. Johnson, in the latter's name with $33,000 furnished entirely by petitioner—Johnson, with whom petitioner joined in all of the trucking enterprises, and petitioner had a partnership agreement which gave petitioner a one-half interest in everything Johnson held in his name. Petitioner continued to advance to Johnson personally or to JML amounts aggregating approximately $125,000, including the initial $33,000. After having been repaid about $52,250 of the $125,000, petitioner was given a 40 per cent interest in JML for the $72,750 balance.

5b After purchasing J. N. Johnson's interest from his estate in 1956, petitioner owned 90 per cent of the stock, valued in 1958 at $1,910,000.

6 Petitioner contributed to capital $2,750, but withdrew his interest from the enterprise before he had actually received his stock.

7a J. N. Johnson first purchased on behalf of himself and petitioner a one-half interest in Melton Tire Co. for $10,000, which he had borrowed from the bank on petitioner's guarantee; by virtue of petitioner's partnership agreement with Johnson, petitioner in effect then owned a one-quarter interest in the company. Shortly thereafter the owner of the other one-half interest (Mr. Melton) withdrew from the business, and petitioner was then given 50 per cent of the company's stock.

7b After purchase from Johnson's estate petitioner owned 100 per cent of the stock. Petitioner drew a salary for years 1954 through 1956, totaling $18,700.

8 After purchase from Johnson's estate petitioner owned 100 per cent of the stock.

9 Petitioner's total investment was subsequently increased to $1,500, a 37½ per cent interest, which was ultimately increased by purchase from Johnson's estate to a 75 per cent interest.

10 Petitioner drew a salary during years 1955 through 1957 totaling $5,500.

11 Total capital contributed to the corporation amounted to about $140.

12 After purchase from Johnson's estate petitioner owned an 81 per cent interest.

13a After purchase from Johnson's estate petitioner owned an 81 per cent interest.

13b Petitioner's wife advanced the money in this case.

14 After purchase from Johnson's estate and others petitioner's interest amounted to more than 90 per cent of the stock.

15 After purchase from Johnson's estate petitioner's interest amounted to more than 95 per cent of the stock.

In 1957, petitioner agreed to finance Milton W. Jacobson in an enterprise to be known as National Motor Rental Company. Petitioner endorsed National Motor Rental's notes for $50,000. Petitioner also contributed cash in the amount of $5,000 to the company and is entitled to two-thirds of the stock of the company.

The advances listed in the chart above as having been made by petitioner to the various enterprises were not represented by any notes or other evidences of indebtedness or secured by collateral; nor did they bear interest or have maturity or repayment dates. Petitioner maintained no record of these advances other than incomplete and inconclusively annotated checkbook stubs.

Petitioner was not engaged in the separate and distinct business of promoting, financing, managing, or of lending money to business ventures during 1952 or 1953. Losses claimed in 1952 of $20,000, and in 1953 of $111,969.60 were not proximately related to or incurred in the course of any business of petitioner. The debt, if such it was, in the amount of $111,969.60 owing from Associated did not become totally worthless in the year 1953.

OPINION.

Petitioner contends that losses with respect to debts of $20,000 involving Manufacturers Research Corporation and $111,969.60 involving Associated sustained in 1952 and 1953, respectively, are deductible in full as business bad debts under section 23(k)(1), I.R.C. 1939, rather than under the limitations of the nonbusiness bad debt provision of section 23(k)(4)[1] as contended by respondent. The trade or business to which these debts were proximately related or in which they were incurred, petitioner asserts, was the business of promoting, organizing, financing, managing, and making loans to business enterprises.

To recognize losses such as those incurred by petitioner as business bad debts, it is well settled that they must have been sustained in

---

[1] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

    (k) BAD DEBTS.—

        (1) GENERAL RULE.—Debts which become worthless within the taxable year; or (in the discretion of the Commissioner) a reasonable addition to a reserve for bad debts; and when satisfied that a debt is recoverable only in part, the Commissioner may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. * * * This paragraph shall not apply in the case of a taxpayer, other than a corporation, with respect to a non-business debt, as defined in paragraph (4) of this subsection. * * *

        *       *       *       *       *       *       *

        (4) NON-BUSINESS DEBTS.—In the case of a taxpayer, other than a corporation, if a non-business debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. The term "non-business debt" means a debt other than a debt evidenced by a security as defined in paragraph (3) and other than a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.

the course of promoting, financing, or lending activity so extensively carried on as to elevate that activity to the status of a separate business. *Ferguson* v. *Commissioner*, 253 F. 2d 403 (C.A. 4), affirming 28 T.C. 432.; *Commissioner* v. *Smith*, 203 F. 2d 310 (C.A. 2), certiorari denied 346 U.S. 816; *Thomas Reed Vreeland*, 31 T.C. 78; *Max M. Barish*, 31 T.C. 1280.

In only a limited number of instances have the promotional and lending activities of taxpayers been determined to have been sufficiently extensive and continuous to constitute an occupation in and of itself, as in *Henry E. Sage*, 15 T.C. 299; *Vincent C. Campbell*, 11 T.C. 510; *Maloney* v. *Spencer*, 172 F. 2d 638 (C.A. 9); *Commissioner* v. *Stokes' Estate*, 200 F. 2d 637 (C.A. 3), affirming a Memorandum Opinion of this Court; *Burgher* v. *Campbell*, an unreported case (N.D. Tex., 1958), 1 A.F.T.R. 2d 1579, 58–1 U.S.T.C. par. 9494; *Giblin* v. *Commissioner*, 227 F. 2d 692 (C.A. 5), reversing T.C. Memo. 1954–186, relied on by petitioners. We have stated in regard to these, however:

> The authority * * * [of such "promoter" or "lender" cases] is applicable only to the exceptional situations where the taxpayer's activities in promoting, financing, managing, and making loans to a number of corporations have been regarded as so extensive as to constitute a business separate and distinct from the business carried on by the corporations themselves. * * * [*Charles G. Berwin*, 20 T.C. 808, 815, affirmed per curiam 211 F. 2d 575 (C.A. 3).]

Toward the end of sustaining the burden of proving that his activities were extensive enough to warrant a finding that he was in such a separate business, petitioner introduced evidence and testified at length concerning the numerous ventures with which he was involved over the course of approximately 30 years. Upon examining the record as a whole, however, we do not feel that petitioner has met his burden of clearly establishing the existence of a separate and distinct business as a promoter, or lender, and we have so found as an ultimate fact.

From the time petitioner graduated from law school in 1918 through 1953, he was actively engaged as an insurance investigator and adjuster, and in the practice of law with a firm which bears his name as the first of four and provides his largest single source of income. During this period we have evidence that he also participated, in one capacity or another, in 22 business ventures, 2 of which are those here in issue. His initial 3 ventures during the 1920's—the demolition project, the toy, card, and gift shop, and the amusement park concessions—were short lived, nonprofitable, remote in years from subsequent activities, and, generally, too insignificant to contribute in the establishment of any pattern of business promotions; nor did they involve any "lending" activity. There remain, then, 17 other enterprises from which petitioner's asserted business must be established. An analysis of the evidence reveals, however, that 11 of these pur-

portedly separate ventures are all related to one field of activity, i.e., the trucking business, the primary source of petitioner's income apart from his law partnership.

In 1945, petitioner and J. N. Johnson acquired 2 trucking franchises and thereupon organized 2 separate corporations known, respectively, as the Atlanta-New Orleans Motor Freight Company (ANO) and Johnson Motor Lines, Inc., (JML). During the course of the following 7 years petitioner and Johnson, who apparently devoted his full time to managing the trucking enterprises, incorporated Wanda Realty Company, Inc., to erect a terminal in Baltimore for JML; Mobile Realty, Inc., to erect a terminal in Mobile, Alabama, for ANO; Melton (or Mecklinburg) Tire Company to service JML; Atlantic Equipment and Manufacturing Company to assemble highway freight trailers; Georgia Interstate Realty to build terminals for ANO; Equipment Leasing, Inc., to lease tractors and trailers to ANO and JML; Highway Service, Inc., to supply parts, maintenance, and garaging to ANO; United Equipment & Service, Inc., to service JML; and Atlantic Terminals and Warehouses, Inc., to erect terminals and warehouses for JML. It is thus apparent in respect to these related and supporting corporations that petitioner was but participating in one enterprise through the medium of separate corporations, each of which can hardly be counted as a separate and distinct promotional or organizational venture. *Holtz* v. *Commissioner*, 256 F. 2d 865 (C.A. 9), affirming T.C. Memo. 1957-106.

It is here also, in respect to the trucking complex of 11 corporations, that the overwhelming proportion of petitioner's purported loans was made. Actually many of the "advances" of which petitioner speaks were bank loans endorsed or guaranteed, and in most cases jointly, by petitioner. Furthermore, almost all of these related companies to which petitioner advanced money were inadequately capitalized and the advances may have been contributions of risk capital rather than genuine loans. Cf. *Phil L. Hudson*, 31 T.C. 574; *U.S. Asiatic Co.*, 30 T.C. 1373; *Gilbert* v. *Commissioner*, 262 F. 2d 512 (C.A.2), affirming T.C. Memo. 1958-8, certiorari denied 359 U.S. 1002. These advances are also noted by the absence of any evidence of indebtedness, interest payments, maturity dates, and collateral, and by reliance solely on the success of the ventures for repayment. Furthermore, the only records that petitioner could produce of his loans were incomplete and inconclusively annotated check stubs and vague recollections—in some cases petitioner was not able to determine whether he or the bank had effected a particular loan. On the whole, the evidence certainly does not bespeak of an individual engaged in the separate and distinct business of lending money.

Viewing the related trucking enterprises as a unit "it is clear that the taxpayers did not make the advances to further any independent promoting business of their own but merely to assist the corporation in its business." *Wheeler* v. *Commissioner*, 241 F. 2d 883 (C.A. 2), affirming per curiam T.C. Memo. 1955–138. We believe petitioner's activities with respect to the trucking enterprises were motivated more by his interest as an investor and as an officer and employee of the various entities than as an independent promoter. At no point is there any indication that petitioner considered disposing of any one of the segments of this profitable enterprise following their successful "promotional" or organizational phases. To the contrary, he continuously increased his investment. Cf. *Giblin* v. *Commissioner*, *supra*. It is now well settled that activity involving the protection or enhancement of one's investments, or otherwise involving their management, however extensive or time consuming, does not constitute a separate trade or business. *Higgins* v. *Commissioner*, 312 U.S. 212; *Commissioner* v. *Smith*, *supra*; *Wheeler* v. *Commissioner*, *supra*; *Thomas Reed Vreeland*, *supra*.

Petitioner also draws our attention to his participation in these corporations in the various capacities of director, officer, or general counsel, and the salaries he has drawn from such positions over the years. It is clear, however, that the management of a corporation's business, or activity as an officer, director, or stockholder, even of several corporations, cannot be held to constitute the conduct of a separate business by petitioner. *Burnet* v. *Clark*, 287 U.S. 410; *Commissioner* v. *Smith*, *supra*; *Charles G. Berwind*, *supra*. The business of this group of related corporations is not the business of petitioner, *Burnet* v. *Clark*, *supra*; *Jan G. J. Boissevain*, 17 T.C. 325; *Langdon L. Skarda*, 27 T.C. 137, affd. 250 F. 2d 429 (C.A. 10), and his activities in regard thereto will not alone serve to establish him in the distinct business of promoting and financing corporations. To the extent petitioner may have participated in the trucking business the most that can be said is that this business was one of two separate businesses with which he was involved—the other being the practice of law. Cf. *Holtz* v. *Commissioner*, *supra*.

Apart from the trucking enterprise consisting of 11 entities, the evidence attests to petitioner's participation in 6 other ventures between 1935 and 1953; in only 1 did his interest continue through and beyond the latter year.[2] To 4[3] of the 6 enterprises, loans are reported to have been made or guaranteed by petitioner, but in our view they,

---

[2] Motor Equipment & Service, Inc.

[3] Downtown Motors, Inc.; Brooklyn Motors; Air Brakes & Controls; and Safety-Lights, Inc. In the case of Motor Equipment & Service, Inc., and Transportation Bureau of Baltimore, his funds were admittedly contributed as capital.

also, are subject to the observations made above concerning the purported loans to the trucking corporations.

Furthermore, there is no evidence that petitioner ever withdrew from a profitable venture conducted in corporate form and treated his profits therefrom as ordinary income. It does not appear that petitioner was engaged in the business of dealing in enterprises, as noted by the Fifth Circuit in *Pokress* v. *Commissioner*, 234 F. 2d 146, footnote 12, page 150, affirming T.C. Memo 1954–128, in there distinguishing the *Giblin* case, but rather it appears that he was investing in various enterprises with the hope of increasing his assets and possibly his income from his law practice by converting his "advances" into a substantial stock ownership in the ventures that proved successful.

In any event, these six ventures since 1935 do not alone, or in conjunction with the trucking enterprise, present activity of the degree or nature, or circumstances so "exceptional" that we are able to conclude that petitioner had by 1952 or 1953 established himself as being in the separate and distinct business of "promoting, financing, managing and making loans" to business ventures, *Charles G. Berwind*, *supra;* nor in the business of "seeking out business opportunities, promoting, organizing and financing them, contributing to them substantially 50% of his time and energy and then disposing of them either at a profit or loss" as found in the *Giblin* case. We think a comparison of the facts in the cases cited by petitioner with the facts of the instant case makes those cases readily distinguishable. Petitioner does not claim that the business of either of the corporations, the advances to which are here involved, was his business.

In respect to the years 1952 and 1953 specifically, outside of activities connected with the several trucking companies and the two unrelated losses here in issue, petitioner does not appear on the record to have placed any loans, nor to have had any outstanding; neither do we have evidence of the promotion, financing, or organization of any new nontrucking enterprises. According to petitioner's tax returns for these 2 years, his largest single source of income was derived from his law partnership ($33,040.87 in 1952 and $36,537.40 in 1953); the major portion of the remaining income was made up of salaries and directors' fees from the trucking companies ($24,526.96 in 1952 and $28,100 in 1953). Interest in 1952 accounted for none of his income, and in 1953, approximately $1,400 is recorded as being received from the trucking concerns and $164 from two individuals of whom we have no knowledge or information. It is difficult to imagine that petitioner could have spent much time or effort in other businesses in these years and the record does not so indicate. These 2 years being those in which the losses are here claimed, petitioner must sustain the burden of proving that they were incurred in or are proximately related to a trade or

business in which petitioner was engaged in 1952 and 1953. *Max M. Barish, supra; Ferguson* v. *Commissioner, supra; Jan G. J. Boissevain, supra.* We believe that he has failed in this burden and hold that petitioner's claimed losses of $20,000 and $111,969.60 did not constitute business "bad debts" within the meaning of section 23(k)(1).

In view of the fact that respondent disallowed the entire $111,969.60 loss claimed in 1953 on the ground that it was not sustained in the year 1953, and because of the alternative issue raised by respondent that the loss, if sustained in 1953, was a capital loss because it was a non-business bad debt under section 23(k)(4), we must determine whether these advances became uncollectible or totally worthless in 1953. Petitioner offered no proof of partial worthlessness or partial chargeoff in 1953. We do not believe that the advances became wholly uncollectible or that the debt, if such it was, became totally worthless in the year 1953.

The actions and views of petitioner himself, as well as others intimately familiar with the tomato-skinning machine, are inconsistent with petitioner's claim that the "loans" became totally worthless in 1953. Although the death of Buck removed the primary mover of the project, men who had worked with him for years were anxious to proceed, with a feeling that success was shortly within reach; the same feelings appeared to be manifested by petitioner in his letters of October 20, 1953, and again in a letter of February 3, 1954. Shuttleworth also was optimistic over the machine's possibilities in February 1954, and petitioner, as late as September 1954, pursued the former's lead to Langsenkamp in connection with further development of the machine. Furthermore, the numerous patents applied for and issued after 1953, together with petitioner's assertions before the Orphans' Court in 1956, when it was apparent that the asset in Buck's estate that might have been of most value was the tomato-skinning machine, belie the total worthlessness of the project in 1953.

In addition to this evidence, we also have difficulty in finding that petitioner's "debt" was totally worthless in 1953 in view of the fact that petitioner had the right to apply against the indebtedness all of Buck's royalty income. Each year Buck, and after his death, his estate was deriving income from the licenses and commercial utilization of the patents on Buck's other machines, all of which, by virtue of the various assignments, was to inure to petitioner's benefit. Between 1953 and 1957, petitioner or Buck's estate did in fact receive $7,000 in royalties. Although the royalties ceased in 1958 due to the licensee's termination of production under the licenses, there was no indication whatsoever in 1953 that this was to be the case, either in 1953 or in 1958. Petitioner's "debt," therefore, could not have been totally worthless in 1953.

618

The conclusions we have reached obviate the necessity of determining respondent's second alternative contention that the advances upon which the 1953 loss was founded were in reality contributions to capital rather than bona fide loans.

*Decision will be entered for the respondent.*