A. J. Whipple and Mildred Whipple v. Commissioner.
Whipple v. Commissioner
Docket No. 65603.
United States Tax Court
T.C. Memo 1960-36; 1960 Tax Ct. Memo LEXIS 258; 19 T.C.M. (CCH) 187; T.C.M. (RIA) 60036; February 29, 1960
*258 Ben H. Schleider, Jr., Esq., and Charles Dillingham, Esq., for the petitioners. D. Louis Bergeron, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent determined deficiencies in petitioners' income tax and in additions to tax for the years 1952 and 1953 as follows: Sec.
Sec.
Sec.
Income
294 [1](d)
294(d)
294
Year
Tax
(1)(A)
(1)(B)
(d)(2)
1952
$ 297.04
$2,664.07
0
$1,776.04
1953
17,625.78
1,326.54
$804.00
248.29
The issues to be decided are (1) whether a $56,975.10 debt owed to petitioners in 1953 which became uncollectible in that year was a business or nonbusiness bad debt within the meaning of section 23(k), and (2) whether $3,349.50, paid by petitioners in 1953 to D. M. Dozier, is a deductible business expense or a capital expenditure. Petitioners abandoned, on brief, all alleged errors in regard to the imposition of additions to tax under section 294(d), except as to the correct amount of additions to tax due for 1953 under section 294(d)(1)(A) which may be resolved in accordance with Rule *259 50 after we dispose of the major issues presented for our decision. Other issues raised by the pleadings have either been conceded or resolved by stipulation. Findings of Fact The stipulated facts are found. A. J. Whipple, hereafter called petitioner, and Mildred Whipple are husband and wife and reside in Houston, Texas. They filed their joint income tax returns for 1952 and 1953 with the district director of internal revenue at Austin, Texas. Petitioner, prior to 1941, was a construction superintendent and an estimator for a lumber company. In 1941, and for about a year thereafter, he and W. E. Brown were partners in the construction of houses and homes. Around 1942 petitioner, Miles Strickland and W. C. Perkins formed the S.W.P. Construction Company, a partnership organized to build houses. Perkins later withdrew from this venture and the partnership became known as S. & W. Construction Company. At some time subsequent to 1942, petitioner and Strickland formed the following partnerships: Evergreen-Rice Company, a construction company; Airline Lumber and Supply Company, Ltd., of which John W. Anderson was also a partner; Shakertown Distributors, formed, with Anderson, to *260 distribute shingles; Gulf Coast Plumbing and Supply Company; and State Tile Distributors, a wholesale tile company which resulted from petitioner's informal negotiations to purchase 4 carloads of tile. During the years 1949 and 1950, petitioner was an original incorporator of 7 corporations, as follows: Federal Road Building Corporation; Richmond Plaza, Inc.; Strickland-Whipple Construction Company, Inc., a successor to the partnership S. & W. Construction Company; Airline Lumber and Supply Company, Inc., a successor to the partnership, Airline Lumber and Supply Company, Ltd.; Dorwayne Construction Corporation; 29th and Airline, Inc., a real estate rental corporation which owned and rented the property occupied by Airline Lumber and Supply Company, Inc., and Shakertown Distributors; and Federal Road Lumber Company, Inc. In 1951 petitioner sold his interest in the 7 above-named corporations and in Shakertown Distributors to Miles Strickland. During the same year he sold to Strickland his equity in 5 other corporations. In his 1951 income tax return, petitioner reported this sale as relating to property he acquired in 1949. These 5 corporations, namely, Industrial Homes, Inc., Harbor *261 Homes, Inc., Commonwealth and California Corporation, Commonwealth and Missouri Corporation, and Riverside Apartments Corporation, were in the rental housing or construction business. All of these sales resulted in gain to petitioner which he reported on his 1951 return as long-term capital gain. In 1951 petitioner purchased the land and improvements located at 2436 Bissonnet Street, Houston, Texas, as the location for various construction businesses and other enterprises. He formed the A. J. Whipple Construction Company, which was a partnership of petitioner, V. L. Yarborough, Leonard Olive and G. A. Durham. This partnership was later succeeded by another partnership, A. J. Whipple Construction Co. No. 2. During the years 1951 and 1952, petitioner was an original incorporator of 8 corporations, as follows: Whipple Lumber Company; Whipple Equipment Co., Inc., which engaged in the business of renting automobiles, trucks and construction equipment; Dozier-Whipple Construction Corporation; Chevy Chase Development Corporation; Whipple Construction Co., Inc.; Angleton Homes Corporation; Angleton Building & Holding Corp.; and Mission Orange Bottling Co. of Lubbock, Inc., hereafter called *262 Mission Orange. During 1952 and 1953, petitioner received salaries totaling $29,400 and $33,450, respectively, from some of the construction corporations. Petitioner acquired land in Pasadena, Angleton, Bellaire and Houston, Texas, and engaged in sales activities with respect to such lands during 1951 through 1953. He purchased a restaurant in Houston and sold it to Guy Frandis on June 1, 1953. At some time he engaged in several oil ventures. On April 17, 1951, petitioner acquired an option to purchase the Mission Orange Bottling Co., a sole proprietorship owned by D. C. Casey. On April 21, 1951, petitioner, as lessee, rented the premises occupied by Casey's business for 20 months, effective May 1, 1951, for $150 per month. On April 25, 1951, petitioner obtained a franchise from the Mission Dry Corporation entitling him to produce, bottle, distribute, and sell Mission beverages in certain counties in Texas. On April 27, 1951, petitioner purchased the bottling machinery and equipment from Casey for $46,225. He conducted this business as a sole proprietorship under the name Mission Orange Bottling Co. until approximately July 1, 1951, when he sold the bottling machinery and equipment *263 to Mission Orange. He did not transfer the franchise to Mission Orange. Mission Orange was organized under the laws of Texas on June 8, 1951, with an authorized capital stock of $20,000, of which amount $10,000 or 100 shares, par value of $100 each, were subscribed to and paid for by the following persons: Shareholder
Office Held
Shares
Par Value
Petitioner
President
88
$ 8,800
James A. Finley
Vice President
10
1,000
Charles Dillingham
Secretary
2
200
Total
100
$10,000 The charter of Mission Orange was amended on December 8, 1952 to increase the authorized capital stock to $40,000. Thereafter the issued and outstanding stock was held as follows: Shareholder
Shares
Per Cent
Par Value
Petitioner
308
77
$30,800
James A. Finley
10
2.5
1,000
Charles Dillingham
2
.5
200
Cecil Clark
20
5
2,000
Dora B. Ellzey
10
2.5
1,000
D. M. Dozier
10
2.5
1,000
Jack Knostman
20
5
2,000
James F. Webster
20
5
2,000
Total
400
100
$40,000 Sometime prior to the end of 1953, petitioner increased his holding to 318 shares, which was 79.5 per cent of those outstanding and represented an investment of $31,800. *264 In 1952 petitioner erected a bottling plant on land which he purchased in Lubbock, Texas. The land and building cost a total of $43,601.70. On July 14, 1952, petitioner leased this plant to Mission Orange for a 10-year term, beginning August 1, 1952, with an option to renew. The prescribed rental was $500 per month for the first 3 years and $500 per month plus 1 per cent of gross sales thereafter. In his 1952 and 1953 return, petitioner claimed a deduction for depreciation of the bottling plant in Lubbock. These returns reflect that petitioner received no rent during either year for that building. Petitioner, directly or indirectly, made cash advances to Mission Orange of $48,550 in 1952 and $6,750 in 1953. He paid Mission Orange's expenses amounting to $2,975.76 during the years 1951 through 1953 and received refunds and credits totaling $4,388.50. The balance due to petitioner by Mission Orange on December 1, 1953, including the amount of $25,502.50 owed him as the result of his sale of the bottling assets to the corporation in July 1951, was $79,389.76. On December 15, 1953, petitioner advanced Mission Orange $48,000 to pay general creditors and on the same date received a *265 transfer from Mission Orange of bottling machinery, equipment and an automobile which had a total book value of $70,414.66. The net amount due by Mission Orange to petitioner on December 31, 1953 was $56,975.10. This debt became worthless in 1953. On September 1, 1951, petitioner acquired stock of a corporation known as Mason Root Beer. This corporation owned a franchise to bottle and sell Mason root beer in Amarillo, Texas. The root beer was bottled at the Mission Orange plant in Lubbock. Mason Root Beer failed in 1953 and petitioner's return for that year reflects a $3,300 loss on his stock in that corporation and a nonbusiness bad debt due from that corporation of $53.33. Petitioner had a vending machine arrangement with Ideal, Indiana, which sold vending machines to the trade. Mission Orange had no interest in this venture. Petitioner made loans to his various corporations, partnerships, fellow shareholders and partners throughout the years in issue. His income tax returns for 1951, 1952 and 1953 reflect interest income as follows: Payor
1951
1952
1953
Whipple Lumber Co., Inc.
$ 19.35
$ 868.51
$1,047.38
Dozier-Whipple Construction Corp.
61.42
393.89
Whipple Construction Co., Inc.
130.68
5.61
Angleton Homes Corp.
391.98
A. J. Whipple Construction Co.
4.92
44.28
Cecil Clark
70.56
45.61
D. M. Dozier
70.56
45.61
G. A. Durham
86.98
74.33
J. A. Finley
64.46
Whipple Equipment Co., Inc.
591.89
575.51
37.82
Willard Evans
70.56
45.61
Dora Ellzey
70.56
45.61
L. R. Olive
24.99
4.76
Durham-Clark Building Supply Co.
9.24
57.95
W. N. Atkins
20.81
(20.81) *
Roy J. Pate
1.19
( 1.19) *
Harland Miller
47.00
The Brag Club, Inc.
53.07
19.16
Guy Francis - Guy's Restaurant
643.23
Total Interest Income
$1,680.15 **
$2,285.35
$1,747.59
*266 Petitioner deducted the debt due from Mission Orange on his 1953 return as a business bad debt. Petitioner was not in the business of organizing, promoting, managing or financing corporations in 1953. He was not in the business of lending money in that year. In his return for 1953, petitioner deducted $3,349.50 as "commissions" paid to D. M. Dozier. Respondent determined that this payment "constitutes part of the cost of acquiring land * * * in 1952 and sold during 1953 * * *." $3,349.50 was entered on petitioner's records as a part of the costs of the purchase of the Westheimer tract, which petitioner purchased on April 3, 1952 for $583,181.47 and sold in 1953 for $672,282.00. At some later time, $3,349.50 was credited on petitioner's records to the Westheimer tract and charged as a direct expense. Petitioner hired Dozier in 1951, agreeing to pay him a salary, expenses and 15 per cent of profits of all joint ventures, partnerships and individual land deals in which petitioner had an interest, except Whipple Lumber Company. Dozier left petitioner's employ in February 1953 before the sale of the Westheimer *267 tract and was paid approximately $29,000 for his share of profits, both realized and anticipated. The $3,349.50 in dispute was included in the foregoing payment. That amount is 15 per cent of the profits anticipated to be realized from the sale of the Westheimer tract. Petitioner failed to file a declaration of estimated tax for 1952. It is stipulated that he filed such a declaration for 1953 on January 14, 1954. Opinion The primary issue here is one that is frequently before this Court. Petitioner, through guarantees or outright loans, advanced substantial sums to a corporation which he controlled. Later developments proved his investment unfortunate and he is here claiming that his uncollectible advances arose out of his trade or business and that he should be permitted to deduct them in full and without regard to the limitations imposed on nonbusiness bad debts by section 23(k)(4). Petitioner would have us find a proximate relationship between the loss occasioned by the worthlessness of the debt due from Mission Orange and any one of three businesses in which he alleges he was individually engaged at the time of the loss. He contends that he was in the business of organizing, *268 promoting, managing and financing corporations, general financing and lending of money, operating a bottling business, or all three. Looking first to petitioner's alleged promotional activities, it is apparent that he was instrumental in incorporating 15 corporations over a period of less than 4 years, commencing in 1949. Fourteen of these corporations were engaged in the construction, building or real estate business. Petitioner owned stock in 5 additional construction or real estate corporations and at one time or another was a member of 10 partnerships involved in similar activities. Individually, petitioner was in the construction or real estate business. "What petitioner fails to recognize is the distinction between carrying on one's business through a corporate form, which, of course, requires some organizing and financing, and the business of dealing in corporations, which may likewise require some financing arrangements. [Holtz v. Commissioner, (C.A. 9) 256 F. 2d 865, 870, affirming T.C. Memo. 1957-106 [16 TCM 439.]" His purpose in forming the 14 *269 corporations was to facilitate his construction or real estate business and not to develop them for sale as going businesses to customers in the course of the business of promoting. H. Beale Rollins, 32 T.C. 604, 615. Petitioner apparently entertained that opinion himself in the year 1951 when in his return for that year he reported the sale of 12 corporations and 1 partnership as the sale of capital assets. See Thomas Reed Vreeland, 31 T.C. 78. The evidence does not show that petitioner's business in 1953 was any different from 1951. Petitioner invites our attention to his 1951, 1952 and 1953 returns to substantiate his claim that he was in the business of lending money. In 1951 he reported the receipt of $1,680.15 as interest from 16 corporations, partnerships or individuals; $1,200.24 of this sum was interest received from his construction corporations or partnerships. In 1952 he reported the receipt of $2,307.35 as interest from 14 corporations, partnerships or individuals; $1,887.80 of this sum was interest received from his construction corporations or partnerships. In 1953, $1,747.59 was reported as interest received from 4 corporations or individuals *270 and $1,085.20 of this amount was received from 2 of his construction corporations. Some of the other amounts were trivial, such as $9.24 and $1.19 received from Durham-Clark Building Supply Company and Roy J. Pate, respectively, in 1951, and $4.76 received from L. R. Olive in 1952. It therefore appears that the bulk of petitioner's loans went to corporations and partnerships in which he had an investment and we cannot find that the purpose of these loans was other than to protect that investment. Such lending activity does not constitute a trade or business. Holtz v. Commissioner, supra. The remaining loans reflected by petitioner's interest receipts were, to a large extent, made to fellow shareholders and partners. We cannot find that lending activity of this nature constitutes a trade or business. However, even if we were to find otherwise, there is no evidence that the advances made to Mission Orange were made as a part of that business. Petitioner received intermittent payments from Mission Orange, admittedly small in amount, but he reflected no amount as having been received as interest and there is no evidence that that corporation agreed or was obligated to *271 pay interest. Without interest petitioner stood to make no profit on the loan, and if there is no prospect of profit there is no trade or business. Thacher v. Lowe, (S.D.N.Y.) 288 F. 994. Petitioner's contention that he was in the bottling business when the debt in question became worthless is without evidentiary support for two reasons. First, petitioner would have us find that he was in the bottling business from December 15 through December 31, 1953 because he was "the dominant stockholder of Masons Root Beer, a participant in soft drink vending machine business, the President of Mission Orange Bottling Co., Inc., the holder of 79% of its stock, the owner of the building in which the bottling plant was located, the holder of the bottling franchise, the owner of the bottling machinery and equipment, [and] the plant manager." Petitioner's relation to Mason Root Beer and Mission Orange as a shareholder, officer or employee does not place him in the business in which the corporations were engaged. Burnet v. Clark, 287 U.S. 410. Although it appears that petitioner *272 had sufficient assets subsequent to December 15, 1953 to engage individually in the bottling business, there is no evidence that he did so, and the mere ownership of these assets does not put him in the bottling business. The second fault we find with petitioner's contention is that the stipulated date of worthlessness of the debt is the year 1953 and there is nothing in the record which might support petitioner's allegation of a more specific date, that is December 31, 1953. If we were required to find a definite time of worthlessness, we should be inclined to select December 15, 1953, at which time petitioner received the bottling assets from Mission Orange in partial satisfaction of that corporation's obligation. At this point petitioner was not in the bottling business. It may be, moreover, that any debt arising at that time was worthless when acquired. Even if we assume that the debt became worthless subsequent to December 15 and at a time when petitioner was in the bottling business, petitioner must still show us the proximate relationship between his business and the bad debt loss. Jan G. J. Bossevain, 17 T.C. 325. We have been unable to ascertain any proximate *273 relationship between the debt owed by Mission Orange, a corporation no longer in the bottling business, and petitioner's alleged business of bottling soft drinks, and petitioner has pointed out none. A more realistic description of that payment might be an exchange or purchase of corporate assets. The bad debt losses in question were not incurred in any trade or business conducted by petitioner. They are nonbusiness bad debts and accordingly are to be treated as short-term capital losses. Section 23(k)(4). The evidence submitted in regard to the second issue is vague and indefinite. Petitioner contends that he paid D. M. Dozier $3,349.50 under a contract of employment. The amount in controversy is claimed to have been but a part of a larger sum paid by check to Dozier. Although the testimony is slight, there is no contrary evidence, and on the strength of petitioner's statements under oath, we accept his version that the payments were ordinary and necessary as compensation for contributing services and not a part of a commission on the purchases of specific property. The final issue concerns additions to tax relating to declarations of estimated tax. The briefs in this case were *274 filed before the Supreme Court handed down its decision in Commissioner v. Acker, 361 U.S. 87. It was held in that case that the additions to tax under section 294(d)(2) are not to be applied when no declaration of estimated tax has been filed. Respondent's determination of additions to tax under section 294(d)(2) for 1952 are accordingly disallowed. For 1953 petitioner did file a declaration of estimated tax, although not until January 14, 1954. Respondent determined that this declaration was untimely and petitioner has offered nothing to indicate the contrary. Nor has petitioner shown that his failure to file a timely declaration was due to reasonable cause and not to willful neglect. The addition to tax determined for 1953 under section 294(d)(1)(A) is therefore upheld. A declaration having been filed for 1953, Commissioner v. Acker, supra, has no application to the addition to tax determined under section 294(d)(2) for that year, and this determination is also upheld. Rose S. Harkins, 33 T.C. 365 (Nov. 30, 1959). Section 294(d)(1)(B) imposes an *275 addition to tax for failure to pay installments of estimated tax when either a timely declaration was filed or a declaration was late due to reasonable cause and not to willful neglect. Respondent may not impose additions to tax under both section 294(d)(1)(A) and section 294(d)(1)(B). Regs. 118, sec. 39.294-1(b)(2). The addition to tax determined for 1953 under section 294(d)(1)(B) is accordingly disallowed. Decision will be entered under Rule 50. Footnotes
1. All section references are to the Internal Revenue Code of 1939.↩
*. Interest accrued and unpaid in 1951. ↩
**. The correct total is $1,690.15.↩