U. S. ASIATIC CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 60595. Filed September 30, 1958.

*Joseph Weill, Esq.*, for the petitioner.
*Charles B. Markham, Esq.*, for the respondent.

PIERCE, *Judge:* The respondent determined deficiencies in income tax for the years 1950, 1951, and 1952, in the amounts of $108.16, $9,569.30, and $1,057.50, respectively. All of such deficiency for 1950, and part of that for 1951, resulted from respondent's disallowance of a reported net operating loss for the year 1948, in respect of which the benefits of a net operating loss carryover had been claimed.

The issues for decision are:

(1) Whether petitioner is entitled to deduct for the year 1948, as an ordinary and necessary business expense, $11,329.85 which it' paid to its sole stockholder immediately after its incorporation on May 3, 1948, as reimbursement for expenses incurred and paid by him in carrying on business from October 1947 through March 1948, and as salary to him for said period.

(2) Whether petitioner is entitled to deduct for the years 1948, 1951, and 1952, amounts paid in 1952 and 1953, as "interest" accrued for the first-mentioned years on all or part of the sum of $71,000, which was carried on its accounts as "loans" payable to its sole stockholder, and which constituted substantially all the funds that were available and used in its operations during said years.

### FINDINGS OF FACT.

Some of the facts have been stipulated. The stipulation, together with the exhibits attached thereto, is incorporated herein by reference.

The petitioner, U. S. Asiatic Co. (sometimes designated as U. S. Asiatic Co., Inc., or U. S. Asiatic Company), is a Pennsylvania corporation which engaged in the business of importing merchandise from Japan. It maintained its accounts and filed its Federal income tax returns on a calendar year basis, and in accordance with an accrual method of accounting. Its returns for all years here involved were filed with the collector of internal revenue for the second district of New York.

Petitioner was incorporated on May 3, 1948. At all times material, its sole stockholder of record, president, and operating head was Sanford H. Hartman.

Hartman, in 1935 and for several years prior thereto, was manager of a retail variety store in Chicago, which was one of a national chain of such stores. He was anxious to organize a business of his own, for importing merchandise from Japan; and accordingly, early in 1936 he resigned his position with the chain store and went to Japan at his own expense, to explore the possibilities for such a business. Dur-

ing this trip he visited Japanese factories, bought a small amount of merchandise, and became acquainted with a Japanese exporter, named Yamakawa. Shortly after his return to the United States in the fall of 1936, he decided that conditions in Japan were not then favorable for such export business; so he discontinued the same, and obtained employment with an insurance office in Pittsburgh, which was operated by his sister's husband, Nathaniel P. Kann. He continued in such employment until September 1943, when he entered the military service.

In 1945, after returning from military service, Hartman resumed his employment with his brother-in-law's insurance office; but he still had a desire to go into the importing business. Accordingly in 1946, he reestablished his contact with the above-mentioned Japanese exporter; and, in about August 1947, he conferred with two individuals, Manheim and Friedman, regarding the possibility of their joining him in a venture for importing and selling goods from Japan.

Manheim was a manufacturer's sales representative, who specialized in selling merchandise to retail chain stores; and Friedman was a manufacturer of electrical supplies, who had sales outlets throughout the United States. The plan which Hartman presented to these men was, that he would utilize his experience and contacts in Japan to buy merchandise for the group; that Manheim and Friedman would utilize their experience and sales contacts in the United States in selling such merchandise to chain stores; and that any profits realized would be split three ways among them. It was anticipated that no substantial amount of capital would be required in such venture; for it was thought that arrangements could be made with Japanese manufacturers whereby the merchandise would not have to be paid for until 90 days after it was shipped from Japan, and it was thought also that in the interim the purchase price could be obtained from selling the merchandise in the United States. The possibility of organizing a corporation to handle the venture was considered; but no definite arrangements were made, for it was decided that such matter should be deferred for future discussion after Hartman had made another trip to Japan.

Following the above discussions, Hartman visited Japan during October and November 1947. While there, he got in touch with Yamakawa, visited factories, obtained price lists for merchandise, and bought samples. Also he discussed with Yamakawa, the possibility of a corporation being organized in the United States under the name of U. S. Asiatic Company, and of another company of the same name being organized in Japan by Yamakawa, so that such companies might handle the importing; but no definite arrangements as to this were made. In all such negotiations and dealings

in Japan, Hartman operated under his own name, or as a representative of Friedman or of Manheim, or as a representative of the firms with which these men were associated.

Upon Hartman's return to the United States in November 1947, he again conferred with Manheim and Friedman; and he told them of difficulties which he had encountered, i. e.: That any merchandise purchased in Japan would have to be paid for prior to its shipment from that country, because he had been unable to make arrangements to defer payment until 90 days after shipment, as originally contemplated; and that shipment of any merchandise so purchased probably would be delayed, because the Japanese factories were not operating at full capacity. Manheim and Friedman, upon receiving such information, decided not to participate in the joint venture which had been contemplated; and they also told Hartman that they would not be willing to organize a corporation with him. They said, however, that they would be willing to sell merchandise for him, on a commission basis.

Hartman then decided to go ahead with the importing business, on his own. Thereafter, from December 1947 through March 1948, he conducted such business from his residence in Pittsburgh. He carried on extensive business correspondence with manufacturers and exporters in Japan; made frequent trips to New York City, where he operated out of Manheim's office; accompanied Manheim on sales visits to chain stores and other potential customers; and obtained several orders, some of which were profitable. Both Manheim and Friedman advanced unspecified amounts of money to him, in order to assist him in meeting his travel and other business expenses, for he had practically exhausted his own savings on his trips to Japan. During all said period, he operated exclusively under his own name.

In about April 1948, Hartman commenced the formation of a corporation to take over his importing business. He engaged an attorney to handle this; and on May 3, 1948, the petitioner corporation, U. S. Asiatic Co., was created under the laws of the Commonwealth of Pennsylvania. The stated capital stock of the corporation was $1,000, represented by 100 shares of common stock, all of which were issued to Hartman. Contemporaneous with such incorporation, a new business office was opened in Pittsburgh; and, for the first time, the name U. S. Asiatic Co. was used in carrying on the business, and was shown on the business stationery and in a telephone listing.

About a month prior to the incorporation of petitioner, Hartman attempted to obtain letters of credit from the Potter National Bank & Trust Company, of Pittsburgh, which were necessary for him to have in order to purchase imports. The Potter Bank, however, de-

clined to issue such letters of credit, on the ground that the merchandise to be imported was not a stable commodity. Hartman then turned to his above-mentioned brother-in-law and former employer, Nathaniel P. Kann, for financial assistance.

Kann had encouraged Hartman, from the beginning, to go into the importing business; and he was fully informed regarding Hartman's plans for such a business, and of his two trips to Japan. Also, Hartman had told him of the difficulty that had been encountered in not being able to arrange for the purchase of merchandise on the contemplated 90-day credit basis, and of the consequent withdrawal of Friedman and Manheim from the venture. Hartman explained that it was necessary for him to acquire funds with which to obtain letters of credit, if he was to go forward with the importing business.

Pursuant to such statements of Hartman, Kann advanced the following amounts for use in such importing business, the first three of which amounts were paid prior to the date of petitioner's incorporation:

| Date | Amount |
|---|---|
| Apr. 6, 1948 | $2,000 |
| Apr. 26, 1948 | 8,000 |
| Apr. 27, 1948 | 2,000 |
| May 3, 1948 | 33,000 |
| June 3, 1948 | 5,000 |
| Sept. 3, 1948 | 15,000 |
| Mar. 1949 | 2,000 |
| Oct. 8, 1949 | 2,500 |
| Mar. 28, 1950 | 2,500 |
| Total | 72,000 |

All these advances were made by check. Most of the checks were drawn to the order of "U. S. Asiatic Company"; but those of September 3, 1948, and October 8, 1949, were made payable to "S. H. Hartman." The first three checks were endorsed, and paid by the drawee bank, prior to the date of petitioner's incorporation.

Said amounts were all paid into the petitioner following its incorporation; and each was recorded on the petitioner's cash receipts book, opposite the name "S. H. Hartman." Also $71,000 of said total amount was, after receipt, carried in the petitioner's accounts and shown on its balance sheet as of December 31, 1951, as "loans payable to S. H. Hartman."[1]

None of said advances was evidenced by any promissory note, or any other written instrument. No collateral security was given for any of the amounts. Also, neither Hartman nor the petitioner made

[1] No explanation is contained in the evidence as to the $1,000 difference between the total advances of $72,000 and the $71,000 carried in said loan account on the corporate books. There is no evidence as to the source of the $1,000 appearing in the capital stock account.

any written agreement as to the payment of interest thereon. However, there was an oral understanding or agreement between Hartman and Kann, that the advances would be repaid when the petitioner was financially able, or not later than 5 years; and also that interest would then be paid at the rate of 5 per cent. There was no understanding or expectation that interest would be paid currently from year to year.

On May 5, 1948, which was 2 days after the date of incorporation, a check was drawn by petitioner to Hartman's order, in the amount of $11,329.85. The purpose of this check was to pay the following items:

$3,000 for salary to Hartman, at the rate of $500 per month, for the period from October 1947 through March 1948;

4,500 for reimbursements to Manheim and Friedman of sums which they had advanced to Hartman during the same period, and for commissions on sales orders which they had obtained during said period;

3,000 for reimbursement to Hartman, for expenses incurred on his trip to Japan in October and November 1947, including $1,700 plane fare; and

829.85 for reimbursement to Hartman, for expenses incurred by him in the United States after his return from said trip to Japan.

The remainder of said $71,000 carried in the above-mentioned loan account, was used by petitioner to obtain letters of credit for the purchase of imports, to pay warehouse charges on certain merchandise received from Japan, and for other corporate purposes.

Capital was an essential factor in the operation of petitioner's business. The following items, respecting the amounts of money available for use in such business, the amounts of petitioner's sales, and the amounts expended by it for the purchase of merchandise and for operating expenses, are reflected in its income tax returns:

*Capital stock, and paid-in or capital surplus.*—At all times material, the amount of petitioner's capital stock was $1,000; and there was no paid-in or capital surplus. The amount of its organization expenses was $606.94.

*Net income or loss per returns, before any net operating loss adjustment:* $9,098.41 loss for 1948; $6,400.79 loss for 1949; $2,670.25 net income for 1950; $26,756.12 net income for 1951; and $8,849.40 net income for 1952.

*Miscellaneous borrowings.*—Exclusive of the above-mentioned $71,000 together with any accrued interest thereon, which was carried on the books as "loans payable to S. H. Hartman," petitioner had the following amounts of borrowings outstanding at the end of the following years: $17,500 in 1948; $7,000 in 1949; $15,301.70 in 1950; and $26,403.37 in 1951. Also at the close of the year 1952, petitioner had

$79,946.25 of loans outstanding; but all or most of this amount was borrowed to pay off the above-mentioned $71,000 and accrued interest.

*Gross sales:* $46,983.44 for 1948; $86,726.50 for 1949; $95,233.91 for 1950; $258,702.92 for 1951; and $263,351.64 for 1952.

*Cost of merchandise bought for sale, including freight, customs duties, insurance, brokers' fees, etc.:* $60,809.40 for 1948; $86,970.90 for 1949; $58,853.20 for 1950; $181,570.16 for 1951; and $249,477.35 for 1952.

*Operating expenses deducted on returns:* $29,753.30 for 1948; $29,021.24 for 1949; $41,356.56 for 1950; $83,373.44 for 1951; and $33,898.06 for 1952.

In 1948, petitioner accrued on its books and claimed as a deduction on its return for that year, $2,087.51 for unpaid interest on the portion then received of the above-mentioned $71,000, which was carried on its books as "loans payable to S. H. Hartman." However in the following year, such accrual was eliminated; and the elimination was explained on its 1949 balance sheet, as "Interest Pay.[able] Written Off."

In 1949 and 1950, no amounts were accrued, and no deductions were claimed on the returns for said years, for interest in respect of said account designated as "loans payable to S. H. Hartman." However, in the subsequent year 1951, petitioner accrued on its books the following amounts, as interest for said years 1948, 1949, and 1950, in respect of said "loans payable to S. H. Hartman": $1,895.20 for 1948; $3,370.89 for 1949; and $3,644.52 for 1950. Also in 1951, it accrued $3,670.51 as interest for that year in respect of said account. The only one of these accruals which it deducted on its returns was the last-mentioned amount; and this was claimed as a deduction on its 1951 return.

In February 1952, Kann executed and delivered a "Subordination Agreement" to the Chase National Bank of the City of New York, in which he represented that petitioner was indebted to him in the amount of $83,580.82, and stated that he would not demand or seek repayment of the same until after all amounts which might be owing by petitioner to said bank had been fully paid. Attached to this subordination agreement was a printed statement signed by petitioner, in which it acknowledged receipt of a copy of such agreement, and agreed that it would not pay any indebtedness owing by it to Kann, in violation of the same. This attached printed statement is the only instrument in evidence, executed by the petitioner, which makes any reference whatever to Kann.

In about October 1952, petitioner paid $71,000 in discharge of said account designated as "loans payable to S. H. Hartman"; and it then also paid $12,580.82 as interest accrued thereon for the years 1948, 1949, 1950, and 1951. This latter amount represented the interest for

said years, which petitioner had accrued on its books in 1951. Subsequently, in February 1953, petitioner paid $3,525, as interest accrued for the year 1952 in respect of said discharged "loans payable to S. H. Hartman"; and it claimed deduction for this amount on its 1952 return. The evidence does not show whether the above payments were made to Hartman and by him delivered to Kann, or were paid directly to Kann; but the amounts were received by Kann.

Respondent, in his notice of deficiency, disallowed the deduction claimed by petitioner for the year 1948, in respect of said $11,329.85 preincorporation expenses; and he disallowed also the deductions claimed for the years 1948, 1951, and 1952, as interest on said account designated "loans payable to S. H. Hartman."

OPINION.

1. The first issue is whether the petitioner corporation should be allowed a deduction for the year 1948, in respect of the $11,329.85 which it paid to Hartman as salary and reimbursement of expenses for the period from October 1947 through March 1948, which was prior to its incorporation. It is our opinion that such deduction is not allowable.

As shown in our Findings of Fact, Hartman visited Japan during October and November 1947, pursuant to arrangements which he had made with Manheim and Friedman, under which the three of them planned to carry on a joint venture for importing and selling merchandise from said country, and under which any profits derived from the venture were to be split three ways among them. Shortly after Hartman's return to the United States, Manheim and Friedman withdrew from participation in such venture; and, thereafter from December 1947 through March 1948, Hartman carried on the importing business as a sole proprietor.

During all the above-mentioned periods, the petitioner corporation was not in existence, either de facto or de jure. Thus, there is no warrant whatever for its attempt to accrue and deduct, as expenses of carrying on its own business after incorporation, salary to Hartman for preceding periods when he could not possibly have been either an officer or employee of the corporation, and business expenses which had been incurred and paid by Hartman during said preceding periods when he was operating either as a joint venturer or as a sole proprietor.

We decide this issue in favor of the respondent.

2. The next issue is whether petitioner is entitled to deduct, for the years 1948, 1951, and 1952, accrued interest on amounts carried in its accounts as "loans payable to S. H. Hartman." The answer to this depends, in the first instance, on whether such amounts actually

represented indebtedness within the meaning of section 23 (b) of the 1939 Code, in respect of which interest might be deductible; or whether, in reality, they represented equity capital invested in the business.

It is well settled that in determining the effect of transactions for income tax purposes, form, though of some evidentiary value, is not conclusive. *Gregory* v. *Helvering*, 293 U. S. 465. The same is true of bookkeeping entries. *Doyle* v. *Mitchell Bros. Co.*, 247 U. S. 179, 187. The important consideration is not the formalities, however meticulously observed, in which the parties cast their transactions; but rather the substance of such transactions and the true nature of the relationship created thereby. *Griffiths* v. *Helvering*, 308 U. S. 355; *1432 Broadway Corporation*, 4 T. C. 1158, affirmed per curiam 160 F. 2d 885 (C. A. 2).

The problem of determining the true nature of advances made to a business enterprise has arisen frequently in cases involving a so-called thin corporation, wherein the major portion of the cash and property required to get the business established and under way was designated corporate indebtedness. See for example: *Emanuel N. (Manny) Kolkey*, 27 T. C. 37, affd. 254 F. 2d 51 (C. A. 7); *R. M. Gunn*, 25 T. C. 424, affirmed per curiam sub nom. *Perrault* v. *Commissioner*, 244 F. 2d 408 (C. A. 10); *Erard A. Matthiessen*, 16 T. C. 781, affd. 194 F. 2d 569 (C. A. 2); *Isidore Dobkin*, 15 T. C. 31, affirmed per curiam 192 F. 2d 392 (C. A. 2); *Swoby Corporation*, 9 T. C. 887. Such problem is a factual one, and requires consideration and weighing of all relevant facts and circumstances of the particular case involved. *Emanuel N. (Manny) Kolkey, supra; Talbot Mills*, 3 T. C. 95, 99, affd. 146 F. 2d 809 (C. A. 1), affd. 326 U. S. 521.

Here, the petitioner corporation at no time had more than $1,000 capital stock; and it had no paid-in or capital surplus. Yet it required and used large sums, for the purchase of merchandise imports; for the payment of ocean freight, customs duties, insurance, warehousing and brokers' fees, in connection with such imports; and for general overhead expenses. It sustained an operating loss of $9,098.41 for the year 1948, and of $6,400.79 for the year 1949; and its net profit for the year 1950 was only $2,670.25. Except for relatively small miscellaneous borrowings, substantially all the funds employed in carrying on its business and paying its above-mentioned costs and expenses, were those carried in its account designated "loans payable to S. H. Hartman," who was its sole stockholder. Excluding again said minor miscellaneous borrowings, the ratio of these so-called Hartman loans to its capital stock, ranged from 64 to 1 at the end of the year 1948, to 71 to 1 at the end of the years 1950 and 1951, and until October 1952 when said loan account was closed. It is obvious, from all these facts, that petitioner was a "thin" corporation; that its

1382

capital structure was wholly unrealistic; and that the funds carried in said Hartman loan account represented substantially all the risk capital employed in its business.

Moreover, none of the formalities normally employed in creating a corporate indebtedness were observed. No promissory notes or other instruments evidencing a debt, were executed. No security was given. There is no evidence of any resolution or other formal corporate action authorizing the creation of any such disproportionately large debt. Also, there is no evidence of any corporate action authorizing the payment of interest on any such debt; and, except for an initial accrual of interest thereon in 1948, which was subsequently reversed and written off in 1949, no interest was accrued on such debt until 1951, when petitioner began to realize substantial profits.

After seeing and hearing the witnesses and after carefully considering and weighing all the evidence, it is our conclusion that all of the $72,000 which was paid into the petitioner corporation pursuant to the arrangement between Hartman and Kann, represented equity capital investments. We also conclude that an arbitrary allocation of said $72,000 was made ($1,000 to capital stock, and $71,000 to debt), which should not be given recognition for income tax purposes. We hold that the deductions for accrued interest here involved were properly disallowed by respondent.

In view of this holding, it is unnecessary for us to pass upon the alternative contention of respondent that, even if the amounts carried in said Hartman loan account did constitute corporate indebtedness, section 24 (c) of the 1939 Code would preclude the deduction of accrued interest thereon, for the asserted reasons that Hartman, the sole stockholder (and not Kann), was the creditor, and that no such interest was paid by petitioner within 2½ months of the close of such years.

*Decision will be entered for the respondent.*